1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9
10
11
12
13
14
15

| | |
|---|---|
| BLOCK MINING, INC., f/k/a/ BLOCKWARE MINING, INC., <br><br> Plaintiff, <br><br> v. <br><br> HOSTING SOURCE, LLC, <br><br> Defendant. | CASE NO. <br><br> **COMPLAINT** |

16
17

Plaintiff Block Mining, Inc. ("Block Mining") brings this lawsuit against Defendant Hosting Source, LLC ("Hosting Source"), and alleges as follows:

18

**INTRODUCTION**

19
20
21
22
23

1.      This case arises from Hosting Source's refusal to return approximately 1,106 Bitcoin ("BTC") miners (the "Rigs") to Block Mining, worth approximately $6.4 million, the BTC that is being mined from them as Hosting Source wrongfully exercises exclusive dominion over the miners, and the BTC that Hosting Source should have mined using Block Mining Rigs had Hosting Source adhered to the plain terms of the parties' agreement.

24
25
26

2.      The 1,106 Rigs are in Hosting Source's possession because the parties contracted for Hosting Source to provide Block Mining with a facility to install Block Mining's Rigs and to ensure that, upon delivery of the Rigs, Block Mining would receive power and connectivity for

1

COMPLAINT

mining ("Mining Power"), so that the Rigs could perform the cryptographic hashing functions needed to mine BTC, as well as 24/7 oversight and security over the Rigs (the "Agreement"). These services are called "colocation services."  The Agreement made clear that Hosting Source was to provide sufficient power and energy to Block Mining's Rigs.  The Agreement also made clear that the Rigs were and always would be Block Mining's "exclusive property" and that, upon termination of the Agreement, Hosting Source was to provide "immediate and unconditional access" to the hosting site where the Rigs were housed so that Block Mining could collect them.

3.      Hosting Source has violated these material provisions.  First, since at least February 2023, Hosting Source has violated the Agreement by operating Block Mining's Rigs in low-power mode, well below the standard set forth in the Agreement.  This resulted in Block Mining's mining far less BTC than it was entitled to under the Agreement had Hosting Source adhered to its terms. Upon information and belief, Hosting Source has provided less power to Block Mining's Rigs because it later entered into contracts that were more remunerative to Hosting Source than the Agreement.

4.      Second, Hosting Source has violated the Agreement by refusing to return Block Mining's 1,106 Rigs.  Upon termination of the Agreement, Block Mining demanded the return of its property.  Hosting Source refused.  Upon information and belief, Hosting Source has either turned the Rigs off altogether or, despite its representations, may be using the Rigs without permission or approval from Block Mining to mine BTC for itself, effectively stealing Block Mining's property.

5.      Through this action, Block Mining seeks to enjoin Hosting Source from its continued interference with Block Mining's ownership rights of its 1,106 Rigs.  It also seeks the monetary damages caused by Hosting Source's year-long disregard of the minimum power levels set forth in the Agreement, which has cost Block Mining substantial amounts it is entitled to had Hosting Source honored the terms of the Agreement.

COMPLAINT

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

**PARTIES**

6.      Plaintiff Block Mining is a Delaware Corporation with its principal place of business in Chicago, Illinois.

7.      Defendant Hosting Source is a Washington limited liability company with its principal place of business in Spokane, Washington.

**JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

9.      Venue in this Court is proper under 28 U.S.C. § 1391(b)(2), or in the alternative, § 1391(b)(3).  Venue is also proper in this judicial district because the parties agreed that "[a]ll disputes, suits, actions, or proceedings relating to this Agreement shall be brought in the state or federal courts located in Seattle Washington."  Hosting Source further agreed to "the exclusive jurisdiction and venue of Seattle, Washington, in connection with any such dispute, suit, action, or proceeding, and waives any defense of *forum inconveniens* in connection therewith."

10.      This Court has personal jurisdiction under RCW 4.28.080 and under Fed. R. Civ. P. 4.

11.      All conditions precedent to bringing this action have occurred, have been performed, or have been waived.

**FACTUAL ALLEGATIONS**

A.      **Background on Bitcoin and Cryptocurrency**

12.      The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," "digital assets," "coins," and "tokens."  Cryptocurrencies are digital assets that hold value and can be used to buy goods and services.  BTC was the first and is currently the most popular cryptocurrency.

3

COMPLAINT

13.     All cryptocurrencies exist on a "blockchain."  A blockchain is an open-sourced string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.

14.     All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are validated in batches of transactions, called "blocks."

15.     Those "blocks" are publicly available and reflect all of the cryptocurrency transactions that occurred on the blockchain at a particular point in time.  Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain"—a "block"-"chain."

16.     BTC is a decentralized, open-source, and peer-to-peer cryptocurrency which requires validation of transactions.  There is no one central authority that controls the supply of BTC or validates transactions involving BTC.  Instead, these functions are widely distributed to the public.

17.     The process by which BTC is created and BTC transactions are validated is referred to as "mining."  Cryptocurrency miners utilize high-powered computers, commonly referred to as "rigs," which devote computer power to solve complex cryptographic puzzles on the BTC network.  Once a miner solves the cryptographic puzzle, it will have validated a BTC transaction and created a new block in the blockchain.

18.     To incentivize participation in the validation of BTC transactions, miners who validate transactions are rewarded with newly-minted BTC.  Currently, the reward for mining one block is 6.25 BTC.

19.     BTC was also designed with scarcity as a central feature.  There is a limited amount of BTC available in the market and available to be mined.  Consistent with this notion of scarcity

COMPLAINT

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

and to guard against inflation, the BTC network is designed to execute a periodic Bitcoin-halving event ("Bitcoin Halving").  Bitcoin Halving occurs each time that 210,000 BTC blocks have been mined, which recently has amounted to roughly once every four years.  Once this occurs, the reward for mining one block is reduced by half, while mining expenses remain the same.  Bitcoin Halving will continue to occur until the maximum supply of 21 million BTC has been mined (the amount of BTC that has currently been mined is roughly 19 million BTC, leaving only 2 million BTC yet to be mined).  The next Bitcoin Halving is expected to occur in April 2024, where the reward for successfully mining one block will be reduced to 3.125 BTC.

20.    As cryptocurrencies have proliferated the market and become widely adopted throughout the world, crypto mining has emerged as a growing industry.  Today, crypto mining is an extremely competitive and difficult industry in which to operate.

21.    Entire facilities have been constructed to house large numbers of rigs dedicated to mining cryptocurrencies every hour of every day.

22.    Facility operators are responsible for monitoring electricity costs, providing the facility with the appropriate temperature for rigs to operate, and ensuring that rigs maintain internet connectivity to participate in cryptocurrency mining.

23.     Because of the difficulty in mining BTC, the BTC mining industry has seen the rise of colocation arrangements whereby a facility operator will open its facility to multiple BTC miners to store their rigs at one facility.

24.    The power necessary to mine BTC is generally expressed in terms of a "hash rate," which is the amount of computing power dedicated to solving the cryptographic puzzles to create additional blocks in the BTC blockchain.  Hash rates are oftentimes expressed in terms of PetaHash per second ("PH/s").

COMPLAINT

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

**B.   Block Mining and Hosting Source Enter Into The Agreement**

25.     In July 2021, Block Mining and Hosting Source entered into the Agreement.

26.     Pursuant to the Agreement, Hosting Source agreed to install 1,610 Rigs called Application-Specific Integrated Circuits[1] that Block Mining purchased from a third party and delivered to Hosting Source's mining facility located in East Wenatchee, Washington (the "Facility").  Hosting Source agreed to house the Rigs in its Facility and "to provide [Block Mining] the mining power" necessary for the Rigs to mine BTC..

27.     Pursuant to the Agreement, Hosting Source is obligated to "use commercially reasonable efforts to . . . assign the Mining Power to [Block Mining's] Operator for purpose of generating Digital Assets and seek to reasonably minimize material interruptions in the Mining Power."

28.     The Agreement specified that the Mining Power Hosting Source would provide to the Rigs would amount to "141,704 TH" (which can also be expressed as 141.704 PH/s).

29.     Further, the Agreement provides that the Rigs are the exclusive property of Block Mining.  Specifically, the Agreement provides that: "For the avoidance of doubt, all [Rigs] shall remain the sole property of [Block Mining].  [Hosting Source] shall use commercially reasonable efforts to ensure [Block Mining] has access to the [Rigs] during business hours and, upon termination of this Agreement, is put into the possession of the [Rigs]."

30.     The Agreement also provides that "[u]pon termination of this Agreement for any reason, [Hosting Source] shall permit [Block Mining] to retake possession of the [Rigs] within 72 hours of notice."   The Agreement further provides that, upon termination of the Agreement, Hosting Source "shall provide [Block Mining] with ***immediate and unconditional access*** to any hosting site(s) in which [Hosting Source] is hosting [Block Mining's Rigs] to allow [Block

---

[1] Application-Specific Integrated Circuits are a type of rig used in Bitcoin mining.  They are integrated circuits specifically designed to efficiently complete the computational tasks necessary to mine Bitcoin.  *See What are ASIC Miners*, Bitmain (July 7, 2022), https://www.bitmain.com/miningScience/details/19.

COMPLAINT

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

Mining] to modify, protect, **or remove** the [Rigs]." (Emphasis added.)   Further, "[i]n the event of any termination by [Hosting Source], [Block Mining] shall be obligated to remove no more than 400 pieces of [e]quipment per month." There is no limit in the Agreement on how many Rigs Block Mining can remove upon termination of the Agreement.

31.     Block Mining also possesses the right under the Agreement to access the Facility to inspect its Rigs.   The Agreement provides that, "Upon 72 hours' written notice, allow [Block Mining] to send staff to the Premises to work with [Hosting Source's] staff and manage their own [Block Mining] servers with the computers of [Hosting Source], under the supervision of [Hosting Source].   [Hosting Source] must accommodate physical access request within 72 hours' [*sic*] of receipt from [Block Mining] and make commercially reasonable efforts to provide physical access to [Block Mining] and [Block Mining's] staff during normal hours on weekdays and reduced operating hours on weekends."

32.     The Agreement also requires Hosting Source to "[p]rovide to [Block Mining] VPN access or other third-party software access in order to view, monitor, and remotely regulate performance of [Block Mining's Rigs]."

33.     The Agreement required Hosting Source to provide Block Mining with "the estimated costs for each month by the 5th day of each month," which Block Mining would "immediately pay.   Hosting Source would thereafter "reconcile the Costs versus the estimated Costs paid by" Block Mining by "the 15th day of the following month."

34.     The Parties agreed that, as Hosting Source's fee for providing its services under the Agreement, the parties would split the BTC rewards that Block Mining's Rigs generated by successfully validating new BTC blocks (the "<u>Bitcoin Rewards</u>").

35.     Specifically, the parties agreed that the Bitcoin Rewards "shall be allocated 80% to [Block Mining] and 20% to [Hosting Source], and the 20% shall then be paid to [Hosting Source] with [Block Mining] retaining the 80% portion."

7

COMPLAINT

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

**C.  Hosting Source Fails To Perform As Promised By The Agreement**

36.  Throughout the Parties' relationship, Hosting Source frequently failed to comply with terms of the Agreements.

37.  Specifically, Hosting Source did not comply with the Agreement's provisions requiring it to provide Block Mining with accounting and reconciliations of the actual costs associated with operating Block Mining's Rigs.  Hosting Source also did not provide Block Mining with the ability to accurately measure the power output to its Rigs and thereby determine whether the Rigs in fact received the requisite mining power.

38.  Instead, Block Mining had to conduct its own internal reconciliations of the amounts Block Mining owed to cover the costs of the Rigs.

39.  In January 2023, Hosting Source informed Block Mining that Hosting Source had received a notice from NYDIG ABL LLC ("NYDIG"), the third-party lender that had financed Block Mining's purchase of the Rigs, stating that Block Mining was in default of the loan obligations to NYDIG.

40.  In the notice, the lender requested that Hosting Source not sell or otherwise remove any of Block Mining's Rigs from the Facility.

41.  Block Mining restructured its loan with the lender, made payments to cure any prior defaults, and received a full release from the lender on February 28, 2023.

42.  Despite this, Hosting Source took the lender's notice as pretext to deviate from its obligations under the Agreement.

43.  Beginning in January 2023, Hosting Source reduced the power output directed towards Block Mining's Rigs, which meant that Block Mining's Rigs were hashing at a rate much lower than the 141.704 PH/s specified in the Agreement.

8

COMPLAINT

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

44.     Upon information and belief, Hosting Source has been redirecting power to its own or other customers miners that are more profitable for Hosting Source.

45.     NYDIG did not instruct Hosting Source to reduce the power output to Block Mining's Rigs nor did the notice that NYDIG provided to Hosting Source give Hosting Source the authority to do so.

46.     Low power mode means that Block Mining's Rigs would be hashing at a PH/s rate much lower than possible.

47.     The Rigs can be set to various different power levels.  These power levels dictate how efficiently the Rigs could perform the cryptographic hashing functions necessary to mine BTC—the higher the power level, the more BTC the Rigs are able to mine over time.

48.     The mode hash rate at "normal" or "full" power would run the Rigs between 135 and 160 PH/s.

49.     The mode hash rate of "low power" mode would run the Rigs between 104 and 123 PH/s and therefore result in less Bitcoin being mined.

50.     The mode hash rate at "low, low power" mode would run the Rigs even lower than that, at 104 PH/s or below.

51.     From March 2023 onwards, Hosting Source ran Block Mining's Rigs on low power mode, often at rates well below 120 PH/s.

**D.      Hosting Source Refuses To Restore Normal Power To The Rigs And Informs Block Mining That Hosting Source Intends To Terminate The Agreement**

52.     In or around October 2023, Block Mining sent personnel to the Facility to inspect the Rigs.

9

COMPLAINT

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

53.     Block Mining identified that Hosting Source was running its Rigs not only at the low rates Block Mining had identified through VPN access, but at rates even lower than that and significantly lower than the rate specified by the Agreement.

54.     After discovering that Hosting Source had impermissibly reduced the power output to the Rigs, Block Mining contacted Hosting Source to request that Hosting Source return the power output to the normal rate specified by the Agreement.

55.     Hosting Source refused to comply with this request—and the terms of the Agreement—instead, citing NYDIG's notice as reason to keep the Rigs running at low power despite the fact that Block Mining had cured any defaults it had with NYDIG.

56.     On November 20, 2023, Hosting Source informed Block Mining that it was refusing to renew the Agreement as it pertained to 402 miners from Block Mining's Rigs at the Facility, claiming that the Parties' arrangement was not economical for Hosting Source given its cost of electricity.

57.     Hosting Source subsequently demanded that Block Mining remove these 402 miners from the Facility.

58.     In December 2023, Block Mining attempted to rework its arrangement with Hosting Source so that the Parties could continue the relationship.

59.     However, Hosting Source backtracked these discussions and continued to decrease the hash rate at which the Rigs were operating.

60.     By January 2024, Block Mining had removed the 402 miners from the Facility per Hosting Source's renewal rejection, which it had agreed to do based on Hosting Source's representations to Block Mining that it would restore the power output to the remainder of the Rigs at the Facility to full power.  However, this never occurred.

COMPLAINT

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

61.     When Block Mining again tried to resolve the issue with Hosting Source, Hosting Source made numerous excuses for the low power output.

62.     Hosting Source then gave Block Mining a 90-day notice to remove the entirety of its Rigs from the Facility, effectively terminating the Parties' relationship.

63.     Only a few days after demanding that Block Mining remove all of its Rigs from the Facility, Hosting Source informed Block Mining that under the terms of the Agreement, only 300 Rigs could be removed every thirty days.

64.     Hosting Source's contract with its power supplier was a "use it or lose it" arrangement, meaning that Hosting Source would be charged for a predetermined amount of power supplied to the Facility regardless of whether such power was directed to a miner or not.

65.     In any event, the Agreement required, and it was understood by Block Mining, that the Rigs were to be run at full power until the respective expiration dates for each tranche of Rigs, which range from April through May 2024.

66.     On February 15, 2024, Hosting Source repeated its representation to Block Mining that it would increase the power output to the Rigs pursuant to a removal schedule extending through July 2024.

67.     Block Mining decided to accept the termination of its arrangement with Hosting Source and recover its Rigs from the Facility as the terms for each miner expired.

68.     However, Hosting Source again failed to provide Block Mining's Rigs with the appropriate amount of power, instead continuing to run the Rigs at extremely low rates.

COMPLAINT

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

**E.    Hosting Source Shuts Off Block Mining's VPN Access And Refuses To Allow Block Mining To Retake Possession Of Its Rigs**

69.    On March 2, 2024, Hosting Source took the extraordinary action of completely and unilaterally shutting down Block Mining's Rigs.

70.    Hosting Source further removed Block Mining's VPN access so that Block Mining was not able to view the performance of its Rigs.

71.    In correspondence with Block Mining, Hosting Source claimed for the first time that it was owed $278,242.41 in fees from Block Mining, the nonpayment of which, according to Hosting Source, was sufficient cause to shut down Block Mining's Rigs.  This is incorrect.  In fact, Bock Mining's accounting demonstrates that Hosting Source owed Block Mining approximately $9,000 at the end of February.

72.    Block Mining paid all fees due to Hosting Source over the course of the Agreement and reconciled all balances owed to Hosting Source as of February 2024.  Upon information and belief, Hosting Source invented the $278,242.41 as a means to have leverage over Block Mining and demand money it has no right to.

73.    In response, on March 2, 2024, Block Mining notified Hosting Source that its personnel would be removing its Rigs from the facility pursuant to the Agreement, starting on March 5, 2024.

74.    On March 5, 2024, Block Mining sent personnel to East Wenatchee, Washington to inspect the status of Block Mining's Rigs, as authorized by Sections 2.4, 2.5, and 11.3 of the Agreement.  Hosting Source was given 72 hours' prior notice of the visit, although such notice was not necessary given Block Mining's right to immediate access upon termination of the Agreement.

COMPLAINT

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

75.     Upon arrival at the Hosting Source Facility, no one appeared.  Block Mining personnel remained on the premises for 25 minutes for someone to appear to allow them to inspect the Rigs.  Again, no one appeared, and the Block Mining personnel left at 10:45 AM.

76.     Block Mining personnel returned to the Facility on the same day at 1:00 PM PT. There was still no Hosting Source personnel present to allow Block Mining to inspect its Rigs, and as earlier in the day, there were no signs of personnel on the premises.

77.     After being contacted by Block Mining on March 5, 2024, Hosting Source reiterated its refusal to give Block Mining access the Facility and remove its Rigs.

## CAUSES OF ACTION

### Count I – Breach of Contract

78.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

79.     Defendant Hosting Source and Plaintiff Block Mining are parties to the Agreement, which is a valid contract under which Defendant agreed to provide colocation services to Plaintiff at normal power, and under which Plaintiff was entitled to remove its Rigs.

80.     Plaintiff has fully performed its obligations under the Agreement, except for any obligations that Plaintiff was prevented or excused from performing.

81.     Defendant has breached the Agreement by doing the following:

    a.   By refusing to allow Plaintiff to retake possession of its Rigs, despite Block Mining's repeated demands and Block Mining's right to its property pursuant to Section 11.3 of the Agreement;

COMPLAINT

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

b.  By providing low power to the Rigs throughout the duration of the Agreement, despite the plain language of the Agreement that required Hosting Source to provide certain Mining Power at all times;

c.  By refusing to provide Plaintiff's personnel with access to the Facility to inspect the Rigs, despite the plain terms of the Agreement that allows Block Mining immediate access to its property;

d.  By shutting off Plaintiff's VPN access to monitor the performance of its Rigs, despite the requirement in the Agreement that Hosting Source provide to Block Mining "VPN access or other third-party software access in order to view, monitor and remotely regulate performance" of Block Mining's Rigs;

e.  By failing to provide Plaintiff with monthly accounting and reconciliations, as Hosting Source is required to do pursuant to Section 2.2 of the Agreement; and/or

f.  By diverting the Bitcoin Rewards itself in excess of the ratio contained in the Agreement.

82.    Defendant's breaches of the Agreement are material.

83.    As a proximate and direct result of Defendant's breaches, Plaintiff has suffered damages including but not limited to out-of-pocket expenses to send personnel to the Facility to correct the harm caused by Defendant's breach, lost revenue from being off-line, and lost profits.

84.    In addition, Plaintiff faces ongoing harm that cannot adequately be compensated by damages and for which it is entitled to injunctive relief.

14

COMPLAINT

**Count II – Conversion**

85.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

86.     Plaintiff has a property interest in the Rigs and is entitled to their immediate possession.

87.     As described above, Plaintiff demanded possession of the Rigs.

88.     Defendant refused to surrender possession of the Rigs.

89.     Defendant is wrongfully denying Plaintiff of its interest in the Rigs by refusing to return them or otherwise allow Plaintiff to recover them.

90.     As a proximate and direct result of Defendant's conversion, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to costs incurred to recover the property at issue, and will continue to suffer irreparable harm, including but not limited to loss of possession of the Rigs, reputational harm, and loss of goodwill among its customers, for which it is entitled to preliminary and permanent injunctive relief.

91.     Defendant's conversion entitles Plaintiff to exercise all available rights and remedies, including without limitation, the right to obtain preliminary and permanent injunctive relief and recover compensatory damages.

**Count III – Trespass to Chattels**

92.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

93.     Defendant deprived Plaintiff of its possession or use of its personal property by refusing to allow Plaintiff access to the Facility and retrieval of its Rigs.

15

COMPLAINT

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

94.     Defendant intended to interfere with Plaintiff's Rigs.  Defendant's mental state in this regard is evident from, among other things, its refusal to provide Plaintiff access to the Facility for inspection and removal of the Rigs after being put on notice, and shutting down the Rigs so it is unable to continue hashing.

95.     Defendant was unjustified in interfering with Plaintiff's possession of the Rigs.

96.     As a proximate and direct result of Defendant's conduct, Plaintiff has suffered damages in and will continue to suffer irreparable harm for which it is entitled to preliminary and permanent injunctive relief.

97.     Defendant's trespass to chattels entitles Plaintiff to exercise all available rights and remedies, including without limitation, the right to obtain preliminary and permanent injunctive relief and recover compensatory damages.

**Count IV – Permanent Injunction**

98.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

99.     Defendant's unlawful taking of Plaintiff's Rigs and the BTC the Rigs are mining has resulted in great and irreparable injury to Block Mining, as Block Mining has been deprived of its ownership rights and of unique, limited, and valuable digital assets.

100.    Plaintiff cannot be fully compensated in damages and is without adequate remedy at law.

**<u>REQUEST FOR RELIEF</u>**

Plaintiff respectfully asks this Court to grant the following relief:

A.      Enter an injunction requiring that Defendant surrender possession of the Rigs to Block Mining without the need for posting bond;

16

COMPLAINT

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

B.    Enter judgment in favor of Plaintiff and against Defendant, granting all monetary and other remedies sought herein;

C.    Award Plaintiff all costs and expenses incurred in this action, including attorneys' fees where appropriate;

D.    Award Plaintiff pre- and post-judgment interest, as allowed by law;

E.    Award Plaintiff such other and further relief as the Court deems just and equitable.


DATED: March 8, 2024                Respectfully submitted,

MCDERMOTT WILL & EMERY LLP

By: s/ Daniel-Charles V. Wolf
Daniel-Charles V. Wolf, WSBA #48211

444 W. Lake St., Ste. #4000
Chicago, IL 60606-0029
(312) 372-2000
dcwolf@mwe.com

Joseph B. Evans, TO APPLY PRO HAC VICE
M. Elias Berman, TO APPLY PRO HAC VICE
One Vanderbilt Avenue
New York, NY 10017-3852
(212) 547-5400
jbevans@mwe.com
eberman@mwe.com

*Attorney for Plaintiff*

COMPLAINT

17