UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BLOCK MINING, INC., <br><br> Plaintiff, <br><br> v. <br><br> HOSTING SOURCE, LLC, <br><br> Defendant. | CASE NO. C24-0319JLR <br><br> ORDER |

## I. INTRODUCTION

Before the court is Plaintiff Block Mining, Inc.'s ("Block Mining") emergency motion for a temporary restraining order ("TRO") and preliminary injunction. (Mot. (Dkt. # 2).) Defendant Hosting Source, LLC ("Hosting Source") opposes the motion. (Notice (Dkt. # 11); Resp. (Dkt. # 14).) The court has considered the motion, the parties' submissions in support of and in opposition to the motion, the relevant portions of the record, and the governing law. Being fully advised, the court DENIES Block Mining's motion.

## II. BACKGROUND

This dispute arises between two entities engaged in the business of mining Bitcoin, a cryptocurrency. The court provides background information on Bitcoin and cryptocurrencies in general before setting forth the relevant factual and procedural history of this case.

### A. Bitcoin Background

Bitcoin ("BTC") was the first and today remains the most popular form of cryptocurrency. (Compl. (Dkt. 1) ¶ 12.) Block Mining describes cryptocurrencies as "digital assets" that, like any other currency, "hold value and can be used to buy goods and services." (*Id.*) All crpytocurrencies exist on a "blockchain," which "is an open-sourced string of code" comprising "the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency." (*Id.* ¶ 13.) When consumers transact in cryptocurrency, those transactions are validated on the blockchain in batches, known as "blocks." (*Id.* ¶ 14.) The blockchain is publicly available and reflects all of the "blocks" of validated transactions that occurred at a particular point in time, ordered by date in a "chain"—hence, "blockchain." (*Id.* ¶ 15.)

BTC is a "decentralized, open-source, and peer-to-peer cryptocurrency." (Marchiori Decl. (Dkt. # 5) ¶ 7.) In other words, there is no single central authority that regulates BTC; instead, the public controls the supply of and validates transactions in BTC. (Compl. ¶ 16.) This process of validating transactions in BTC and thereby creating new BTC is known as "mining." (*Id.* ¶ 17.) BTC miners use high-powered computers, commonly referred to as "rigs," to solve complex cryptographic puzzles on

the BTC network. (*Id.* ¶ 17; Marchiori Decl. ¶ 8.) By solving the puzzle, the miner validates a BTC transaction, creates a new block in the blockchain, and unlocks newly minted BTC. (Compl. ¶¶ 17-18; Marchiori Decl. ¶¶ 8-9.) Newly minted BTC is awarded to successful miners in order to generally incentivize participation in the validation of BTC transactions. (Compl. ¶ 18.) Mining is the only way for new BTC to enter the market. (Marchiori Decl. ¶ 14.) The current reward for mining one block is 6.25 BTC.[1] (*Id.* ¶ 16.)

Block Mining owns and operates cryptocurrency mining facilities around the country, focusing its efforts on BTC. (Marchiori Decl. ¶¶ 6-7.) Because BTC was "designed with scarcity as a central feature," there is only a limited amount of BTC on the cryptocurrency market and available to be mined. (Compl. ¶ 19.) All together, there exists a maximum supply of 21 million BTC. (Marchiori Decl. ¶ 15.) Approximately 19 million BTC has already been mined, leaving just 2 million remaining to be mined. (*Id.*) To ensure scarcity and prevent inflation, the BTC network also executes "a periodic Bitcoin-halving event" (the "Bitcoin Halving") every time that 210,000 BTC blocks have been mined, or approximately once every four years. (Compl. ¶ 19; *see also* Marchiori Decl. ¶¶ 12-13.) The Bitcoin Halving reduces the reward for mining BTC by half and is expected to occur next month, in April 2024. (Marchiori Decl. ¶ 12.) Accordingly, the

---

[1] As of this writing, Bloomberg values 1 BTC at $68,454.50 USD. *BXBT-USD Cross Rate*, Bloomberg, https://www.bloomberg.com/quote/XBTUSD:CUR (last visited Mar. 15, 2024).

ORDER - 3

reward for mining one block will soon reduce to 3.125 BTC, making it "comparatively more expensive to mine a single BTC." (*Id.* ¶¶ 16-17.)

As Block Mining explains, "crypto mining is an extremely competitive and difficult industry in which to operate." (Mot. at 5.) One challenge is that BTC mining requires significant computer power, which is measured "in terms of hash rate." (Marchiori Decl. ¶ 22; *see also id.* ¶¶ 8, 10.) The "hash rate" is "the amount of computing power dedicated to hashing functions in terms of Peta units, which is measured in PetaHash per second ('PH/s')." (*Id.* ¶ 22.) Rigs can operate at varying power levels; the higher the hash rate, "the more BTC the Rigs are able to mine over time." (*Id.* ¶ 34.) The rise of BTC and the challenges that come with mining it have spawned an entire pseudo-industry of mining-related services known as "colocation services," which include "providing a suitable environment, maintenance, and expertise to run BTC miners, including power and electricity to rigs." (*Id.* ¶¶ 10-11.) The instant dispute stems from a contract between Block Mining and Hosting Source for the provision of these colocation services.

**B.     The Contract and the Fallout**

In July 2021, Block Mining and Hosting Source entered into a Colocation Mining Services Agreement (the "Agreement") with respect to 1,610 rigs (the "Rigs") that Block Mining had purchased from a third party for $6,405,637.87. (*Id.* ¶ 20 & Ex. A ("Agreement"); Ellingson Decl. (Dkt. # 4) ¶ 17.) Hosting Source agreed to house and operate the Rigs at its mining facility located in East Wenatchee, Washington (the "Facility"). (Marchiori Decl. ¶ 20.) Under the Agreement, Hosting Source was to install

the Rigs and power them at a hash rate of 141.7 PH/s, allowing the Rigs to efficiently perform cryptographic functions and mine BTC.  (*Id.* ¶¶ 21, 23 & n.2; *see also* Agreement, Ex. A §§ 1.8, 4, Exs. B-C.)  The Agreement also provided Block Mining with certain physical and remote VPN access rights so it could monitor and inspect its Rigs.  (Marchiori Decl. ¶¶ 25-27; *see also* Agreement, Ex. A §§ 2.5, 2.7.)  In exchange for colocation services, Hosting Source earned a portion of the BTC rewards generated by Block Mining's Rigs at the Facility.  (*Id.*, Ex. A § 6.)  Block Mining ultimately delivered 1,508 Rigs to the Facility for colocation services.  (Marchiori Decl. ¶ 20.)

In early 2023, Hosting Source received notice from third party lender NYDIG ABL, LLC ("NYDIG") that Block Mining had defaulted on its loan obligation with respect to the Rigs.  (Reden Decl. (Dkt. # 15) ¶ 3, Ex. 2.)  Thereafter, Hosting Source began reducing the power ouput to Block Mining's Rigs and made arrangements to remove the Rigs so that NYDIG could take possession of them.  (Marchiori Decl. ¶¶ 28-31 & Ex. B.)  Block Mining cured the delinquency by February 28, 2023.  (*Id.* ¶ 30, Ex. C.)  Nevertheless, Hosting Source continued to operate the Rigs on "low power mode" despite Block Mining's repeated requests to restore them to "full power" as set forth in the Agreement.  (*Id.* ¶¶ 32-39.)  This was concerning to Block Mining, because "by placing a miner in 'low power mode,' the miner does not hash at its highest rate, thereby decreasing the amount of BTC that is mined on any given day."  (*Id.* ¶ 32.) According to Block Mining, the loan arrangement "had no bearing on the Agreement" and Hosting Source therefore had no right to reduce the power output.  (*Id.* ¶ 30.)  Yet Hosting Source kept "Block Mining's Rigs running at low power, continuing to cite the

unrelated loan as cause to do so." (*Id.* ¶ 39.) Block Mining asserts that, during this time, Hosting Source was "redirecting power from Block Mining's Rigs to, upon belief, other miners from whom Hosting Source earned more money." (*Id.* ¶ 28.)

In November 2023, Hosting Source elected to terminate the Agreement with respect to 402 Rigs and the parties arranged for their removal, which was completed in February 2024. (*Id.* ¶¶ 42-45, 52-55.) Block Mining consented to the removal on the understanding that Hosting Source would restore full power to the remaining 1,106 Rigs. (*Id.* ¶¶ 52-55.) Hosting Source asserts that its offer to restore the Rigs to full power was contingent on the use of third-party power sources, to which Block Mining refused to agree. (Resp. at 6 (citing Marchiori Decl. ¶ 49, Ex. G).) Hosting Source never restored the remaining Rigs to full power and instead terminated the Agreement entirely. (Marchiori Decl. ¶¶ 55-56.)

Hosting Source proposed a schedule to remove the remaining Rigs in batches over the course of several months through July 2024, citing a provision of the Agreement that states: "In the event of any termination by [Hosting Source], [Block Mining] shall be obligated to remove no more than 400 pieces of Equipment per month." (Agreement, Ex. A § 11.1; Marchiori Decl. ¶¶ 56-57 & Ex. I.) Block Mining initially agreed to this proposal. (Marchiori Decl. ¶ 57.) But in early March 2024, Hosting Source demanded that Block Mining pay it $278,242.41 in claimed fees and removed Block Mining's VPN access, preventing Block Mining from monitoring its Rigs. (*Id.* ¶¶ 59-60 & Ex. J.) Block Mining refused to pay, denying that it owed any fees to Hosting Source. (*Id.* ¶ 61 & Ex. I.)

On March 2, 2024, Block Mining informed Hosting Services that it intended to retake possession of all of the Rigs beginning on March 5, 2024, citing a provision of the Agreement that states: "Upon Termination of this Agreement for any reason, [Hosting Source] shall permit [Block Mining] to retake possession of the Mining Equipment within 72 hours notice." (Agreement, Ex. A § 2.4; Marchiori Decl. ¶ 64 & Ex. L.) Block Mining representatives traveled from Chicago, Illinois to East Wenatchee, Washington on March 5 to collect the Rigs, but arrived to a "deserted or abandoned" Facility. (Ellingson Decl. ¶¶ 23-27 & Ex. B.) Block Mining was unable to recover its Rigs. (*Id.* ¶ 27; Marchiori Decl. ¶ 65.)

C. **Procedural History**

Block Mining filed this lawsuit on March 8, 2024, seeking compensatory damages and a permanent injunction in connection with its claims for breach of contract, conversion, and trespass to chattels under Washington law. (Compl. ¶¶ 78-100.) Block Mining alleges that "Hosting Source has either turned the Rigs off altogether or, despite its representations, may be using the Rigs without permission or approval from Block Mining to mine BTC for itself, effectively stealing Block Mining's property." (*Id.* ¶ 4.)

Concurrently with its complaint, Block Mining filed the instant emergency motion for a TRO and preliminary injunction, arguing that Hosting Source is holding its Rigs "hostage" at a critical time in the Bitcoin mining industry—just one month before the Bitcoin Halving. (Mot. at 1.) Block Mining seeks an order compelling Hosting Source to: (1) facilitate Block Mining's access to and recovery of its Rigs within 24 hours of the court's ruling; (2) immediately restore Block Mining's VPN access and remote

monitoring capabilities; (3) provide an accounting "showing each and every BTC that was mined while Hosting Source denied Block Mining access to the machines, the wallet the BTC was mined into, any transfers of the BTC from one wallet to another, and the current location of any BTC mined using Block Mining's Rigs"; and (4) "place into a trust account each and every BTC that was mined using Block Mining's Rigs." (*Id.* at 20-21.)

Hosting Source responds that the requested relief is inappropriate, extreme, and unnecessary as "there is no harm but monetary damages." (Resp. at 1-3.)

### III.   ANALYSIS

Below, the court sets forth the relevant legal standard before turning to the merits of Block Mining's motion.

**A.   Legal Standard**

The standard applicable to a motion for a TRO is "substantially identical" to the preliminary injunction standard. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Both forms of relief are "extraordinary" remedies that are "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). Instead, provisional remedies "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. Although the standard governing TROs and preliminary injunctions is the same, they serve fundamentally different purposes. The purpose of a TRO is to preserve the status quo and prevent irreparable harm until a hearing can take place on the propriety of a preliminary injunction. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (citing *Granny Goose*

*Foods, Inc. v. Teamsters*, 415 U.S. 423, 439 (1974)).  In turn, the purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered.  *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).

A plaintiff seeking a TRO or preliminary injunction must show that:  (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest.  *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  The Ninth Circuit applies a "sliding scale" approach when considering the *Winter* factors.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).  "Under this approach, the elements of the preliminary injunction test are balanced, [meaning] a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to [the] plaintiff might offset a lesser showing of likelihood of success on the merits." *Id.* at 1131.  Notwithstanding this "sliding scale" balancing approach, "[a]ll four [*Winter*] elements must be satisfied" to obtain a preliminary relief.  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022).  The moving party bears the burden of persuasion and must make a clear showing that it is entitled to such relief.  *Winter*, 555 U.S. at 22.

**B.  Block Mining's Motion**

Block Mining fails to demonstrate a likelihood of irreparable harm, and the court denies the motion on this basis alone.  *See Ctr. For Food Safety v. Vilsack*, 636 F.3d

1166, 1174 (9th Cir. 2011) (declining to address remaining *Winter* factors upon determining that plaintiffs failed to show they were likely to suffer irreparable harm).

The Ninth Circuit makes clear that "a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm." *Caribbean Marine Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Winter*, 555 U.S. at 20-22 (rejecting an approach that permitted mere "possibility" of irreparable harm upon a strong showing of likelihood of success on the merits). "Those seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm"—mere speculation does not suffice. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250-51 (9th Cir. 2013). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Az. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). It is well established that "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

Here, Block Mining argues it will be irreparably harmed absent preliminary relief allowing it "to take back possession of its Rigs so it can do what Block Mining does: mine BTC." (Mot. at 17.) Block Mining attempts to frame the harm in terms of property rights in its Rigs. (*Id.* at 17-18 (citing *Energy Power Co. v. Xiaolong Wang*, No. 13-CV-1134, 2013 WL 6234626, at *10 (D. Mass. Dec. 3, 2013) (holding that "intereference with a possessory interest in personal property can constitute irreparable harm")).) In at least one instance, the Ninth Circuit has found a likelihood of immediate

irreparable harm based on an imminent threat to one's property interests. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003) (upholding TRO requiring the defendant to freeze her assets, where she had a history of "fraudulent intra-family transfers" for the "purpose of frustrating creditors").

In arguing there exists a likelihood of irreparable harm to its property interests, Block Mining relies heavily on *EZ Blockchain LLC v. Blaise Energy Power, Inc.*, an out-of-circuit case with somewhat similar facts. 589 F. Supp. 3d 1102 (D.N.D. 2022). The plaintiff in *EZ Blockchain* owned and operated data centers in which customers installed rigs for the purpose of cyptocurrency mining. *Id.* at 1106. The parties executed a contract in which the defendant agreed to provide energy services to one of these data centers. *Id.* When the parties' relationship fell apart, the defendant moved a pallet of the plaintiffs' rigs into his shop, physically blocking access and refusing to return them until the plaintiff ensured payment on the terminated contract. *Id.* at 1107. The defendant threatened to sell the miners if the plaintiff failed to remit payment within 15 days. *Id.* In granting the plaintiff a TRO, the district court found irreparable harm based on the fact that "[t]he miners are sophisticated technology and cannot be easily replaced." *Id.* at 1109.

The logic of *EZ Blockchain* does not extend to the instant case, where there has been no threat to sell or otherwise destroy or discard Block Mining's Rigs. To the contrary, the evidence shows that Hosting Source has agreed to return Block Mining's Rigs—specifically, on a staggered monthly schedule extending through July of this year. (*See* Marchiori Decl. ¶ 60, Ex. J.) The apparent reason that schedule is unsatisfactory to

Block Mining is because of the imminent Bitcoin Halving, which will make cryptocurrency mining comparatively more expensive and less profitable starting in April.  (*See* Mot. at 18 ("Due to the all-time high prices, after years of volatility, mining is currently profitable" and "[w]ith the Bitcoin Halving also looming," "there has also never been a more competitive time to be a BTC miner . . . .").)  Although Block Mining is correct that its Rigs "are sophisticated technology and cannot be easily replaced" (Mot. at 18 (quoting *EZ Blockchain*, 589 F. Supp. 3d at 1109)), Block Mining's problem is not that it may never recover its Rigs, but that it may not recover the Rigs in a sufficiently timely manner allowing it to maximize its profits.  That is not enough to establish a likelihood of irreparable harm.  Ninth Circuit precedent only reinforces this conclusion.  Although *New Images of Beverly Hills* recognized that a threat to property can constitute irreparable harm, the defendant's conduct in that case threatened to dissipate assets.  *See New Images of Beverly Hills*, 321 F.3d at 880-81.  Not so here.

   To the extent Block Mining argues that Hosting Source's "interference with Block Mining's business operations" constitutes irreparable harm (Mot. at 17), that argument similarly fails.  Although the Ninth Circuit has recognized that "[t]he threat of being driven out of business" can constitute irreparable harm, courts require strong evidence that bankruptcy or extinction is likely.  *Am. Passage Media Corp. v. Cass Commc'ns.*, 750 F.2d 1470, 1474 (9th Cir. 1985) (concluding that evidence of large sustained losses over two years was "insufficient evidence that [the movant was] threatened with extinction"); *see also Blocktree Props., LLC v. Pub. Utility Dist. No. 2 of Grant Cnty.*, 380 F. Supp. 3d 1102, 1126 (E.D. Wash. Mar. 29, 2019) (concluding that businesses

engaged in cryptocurrency mining failed to establish irreparable harm based on significant increases to the cost of electricty, where the evidence showed only "a mere possibility of bankruptcy"). Block Mining makes no argument that Hosting Source's conduct will force it out of business absent the requested relief, nor has Block Mining provided any evidence of the same.

In sum, preliminary relief is not warranted because the harm at issue is plainly economic and thus can be remedied by an award of damages. *Rent-A-Ctr., Inc.*, 944 F.2d at 603.

## IV.  CONCLUSION

For the foregoing reasons, the court DENIES Block Mining's motion for a TRO and preliminary injunction (Dkt. # 2).

Dated this 18th day of March, 2024.

JAMES L. ROBART
United States District Judge