1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Honorable James L. Robart

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

BLOCK MINING, INC., f/k/a
Blockware Mining, Inc.,

        Plaintiff,

v.

HOSTING SOURCE, LLC,

        Defendant.

CASE NO. C24-0319-JLR

**PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANT'S
PARTIAL MOTION TO DISMISS
UNDER RULE 12(b)(6)**

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION .................................................................................................1

II.  FACTUAL BACKGROUND ...............................................................................2

    A. Background on Cryptocurrency and BTC ................................................2

    B. The Colocation Agreement ......................................................................2

    C. Hosting Source Fails to Live Up to, and Eventually Terminates, the
        Agreement .................................................................................................3

    D. Hosting Source Shuts Off Block Mining's VPN Access...........................4

    E. Procedural History ...................................................................................4

III. ARGUMENT ......................................................................................................5

    A. Legal Standard ........................................................................................5

    B. Block Mining States a Claim for Conversion Because it Specifically Alleges
        that Hosting Source is Unlawfully Retaining its Mining Rigs and is "using the
        Rigs . . . to mine BTC for itself".............................................................5

        1. Block Mining is Entitled to "Immediate Possession" of its "Exclusive
           Property" Under the Plain Text of the Agreement..............................6

        2. Nowhere Does the Complaint Allege that Block Mining Consented to
           Hosting Source's Continued Withholding of the Rigs .......................7

        3. Block Mining's Conversion Claim is Based On Hosting Source
           Unlawfully Withholding the Rigs and Misappropriating the BTC
           Those Rigs Are Mining......................................................................9

    C. Block Mining States A Claim for Trespass To Chattels Because Hosting
        Source Has—For Almost Two Months—Prevented Block Mining From
        Accessing Its Rigs..................................................................................10

        1. Hosting Source Breached a Tort Law Duty by Intentionally Interfering
           with Block Mining's Possessory Interest in the Rigs. ....................10

        2. Nothing in the Agreement or in the Law of Torts Allows Hosting
           Source to Deny Block Mining Access to Its Own Property Just
           Because the Parties Are Involved in a Dispute.................................11

3. Hosting Source's Argument that "Block Mining Cannot Prove Damages" is Inapposite Because a Claim for Trespass to Chattels Seeks Redress for Injury to a Property Interest. .............................12

D. Dismissing Block Mining's Request to Pursue Injunctive Relief Would be Premature ..................................................................................................13

E. In the Alternative, the Court Should Direct Block Mining to File an Amended Complaint Rather than Dismiss any Claims that the Court Believes are Deficient as Pled. ..............................................................................14

IV. CONCLUSION.............................................................................................15

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4    *Ashcroft v. Iqbal,*
5        556 U.S. 662 (2009).....................................................................................................5

6    *Barnett v. Buchan Baking Co.,*
        724 P.2d 1077 (Wash. Ct. App. 1986)........................................................................8

7    *Bell Atl. Corp. v. Twombly,*
8        550 U.S. 544 (2007).....................................................................................................5

9    *Burdick v. Bank of Am. N.A.,*
        99 F. Supp. 2d 1372 (S.D. Fla. 2015).......................................................................13
10

11   *Eastwood v. Horse Harbor Found., Inc.,*
        241 P.3d 1256 (Wash. 2010).....................................................................................11

12   *eBay Inc. v. MercExchange, LLC,*
13       547 U.S. 388 (2006)...................................................................................................13

14   *Fuji Food Prods., Inc. v. Occidental, LLC,*
        2018 WL 6310090 (Wash. Ct. App. 2018)................................................................11
15

16   *Hoang v. Bank of Am., N.A.,*
        910 F.3d 1096 (9th Cir. 2018) ..................................................................................14

17   *Judkins v. Sadler-Mac Neil,*
18       376 P.2d 837 (Wash. 1962)..........................................................................................6

19   *Knievel v. ESPN,*
        393 F.3d 1068 (9th Cir. 2005) ....................................................................................5
20

21   *Lenelson v. Wells Fargo Bank, N.A.,*
        641 F. Supp. 3d 1005 (W.D. Wash. 2022)..................................................................5

22   *McCurdy v. Union Pac. Rwy. Co.,*
23       413 P.2d 617 (Wash. 1966)........................................................................................12

24   *Newcal Indus. Inc. V. Ikon Office Sol.,*
        513 F.3d 1038 (9th Cir. 2008) ....................................................................................5
25

26   *Penwell v. Obenland,*
        2016 WL 7736954 (W.D. Wash. 2016)......................................................................13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Rubenstein v. Neiman Marcus Grp.*,
   687 F. App'x 564 (9th Cir. 2017) ........................................................5

*Soo Park v. Thompson*,
   851 F.3d 910 (9th Cir. 2017) ..............................................................5

*Unified Data Servs., LLC v. Fed. Trade Comm'n*,
   39 F.4th 1200 (9th Cir. 2022) ............................................................14

*United Federation of Churches, LLC v. Johnson*,
   598. F. Supp. 3d 1084 (W.D. Wash. 2022)..........................................6

**Other Authorities**

Fed. R. Civ. P. 8(a)(2).............................................................................5

Fed. R. Civ. P. 15(a)(2)..........................................................................14

REST. (1st) TORTS, § 237 (1934)..............................................................6

REST. (2d) TORTS, § 928 (1979)..............................................................12

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

1       Plaintiff Block Mining, Inc. ("Block Mining") submits this brief in opposition (the

2  "Opposition") to Defendant Hosting Source LLC's ("Hosting Source") motion to dismiss Block

3  Mining's Complaint (Dkt. No. 25) (the "Motion").

### I. INTRODUCTION

5       Hosting Source has held Block Mining's mining rigs (the "Rigs") hostage for over two

6  months. During that time, Hosting Source has engaged in a wide range of wrongful conduct well

7  outside the bounds of the parties' Colocation Agreement (the "Agreement"), including stealing

8  Bitcoin ("BTC") mined by Block Mining's Rigs. To hide this misconduct, Hosting Source has

9  refused to provide the Rigs back to Block Mining and has blocked Block Mining from remote

10 Virtual Protocol Network ("VPN") access necessary to track the Rigs. As much as Hosting Source

11 would like it to be, this is not merely a breach of contract case—Hosting Source refuses to return

12 Block Mining's Rigs so that Hosting Source can continue to divert BTC to itself.

13      Hosting Source's acts give rise to multiple claims under Washington law, not just a breach

14 of contract claim, as Hosting Source argues. In addition to alleging numerous breaches of

15 contract—which Hosting Source has not asked the Court to dismiss—Block Mining's Complaint

16 alleges that Hosting Source committed intentional torts of conversion and trespass to chattels by

17 refusing to return Block Mining's Rigs, barring Block Mining from using, accessing, or monitoring

18 the Rigs, and "using the Rigs without permission or approval from Block Mining to mine BTC for

19 itself, effectively stealing Block Mining's property." (Dkt. No. 1, ¶4.) Hosting Source now asks

20 the Court to dismiss all but one of Block Mining's claims against it on the grounds that Hosting

21 Source's misconduct, at most, amounts to a breach of contract.

22      Hosting Source violated not just duties arising from the parties' Agreement but also those

23 arising from tort law. Contrary to Hosting Source's arguments, Block Mining never consented for

24 Hosting Source to withhold the Rigs or to withhold BTC mined by the Rigs. Hosting Source

25 seemingly acknowledges that it has refused to return or to let Block Mining access or use Block

26 Mining's own property for almost two months, yet Hosting Source claims this refusal was

"reasonable" because the relationship with Block Mining had grown "contentious."

OPPOSITION MOTION TO DISMISS
C24-0319-JLR – 1

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

1  Contentiousness does not give someone license to commit torts or ignore the property rights of

2  those with whom one does business. While Hosting Source's initial possession of the Rigs may

3  have been authorized, that authorization ended months ago.

4      For the reasons set forth above and as Block Mining will further describe below, Block

5  Mining respectfully asks the Court to deny Hosting Source's Motion. If, however, the Court is

6  inclined to grant dismissal of any of Block Mining's claims, Block Mining asks the Court, in the

7  alternative, to direct Block Mining to file an amended complaint.

8  ## II.    FACTUAL BACKGROUND

9  ### A.    Background on Cryptocurrency and BTC

10      To help guide the Court in understanding certain complex, technical concepts about

11  cryptocurrency relevant to this dispute, Block Mining has addressed the background surrounding

12  cryptocurrency and BTC in detail in its prior submissions. (*See* Compl., Dkt. No. 1, ¶¶12–24; Dkt.

13  Nos. 2 at 3–5, 37 at 5–7.) Block Mining therefore respectfully refers the Court to those filings so

14  as not to repeat unnecessary information about which there is little meaningful dispute and with

15  which the Court may already be familiar.

16  ### B.    The Colocation Agreement

17      In July 2021, Block Mining and Hosting Source executed the Agreement, under which

18  Hosting Source agreed to install 1,610 of Block Mining's Rigs at Hosting Source's facility in

19  Wenatchee (the "Facility"). (*See* Dkt. No. 5-1.)[1] Under the Agreement, Block Mining agreed to

20  provide its Rigs, which were and are its property, and Hosting Source agreed to provide the

21  Facility, internet connection, and electricity. (*See* Dkt. No. 1, ¶¶25–29.) Pursuant to the Agreement,

22  the parties agreed that they would split the BTC Rewards produced by Block Mining's Rigs by

23

24  [1] Hosting Source's Motion relies on several documents not attached to the Complaint. (*See* Dkt.

25  25 at 4–5.) While Block Mining has no objection to Hosting Source citing documents that Block Mining has already placed in the record, whether by referring to them in its Complaint or

26  submitting them in support of its motion for injunctive relief (Dkt. No. 2), Block Mining believes Hosting Source's submission of additional documents outside the pleadings is improper. In any event, Hosting Source's Motion still fails with or without such extrinsic evidence.

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

allocating 80% of the BTC Rewards to Block Mining and 20% of the BTC Rewards to Hosting Source. (Dkt No. 5-1, at 5 (§ 6), 13 (Ex. D).) The Agreement required Block Mining to maintain a digital wallet address where it could receive the BTC mined from its Rigs. (*See* Dkt. No. 5-1 at 4, § 3.1.)

Block Mining also agreed to cover the costs of running its Rigs at the Facility. (*See id.* at 5, § 5.) But for Block Mining to know how much to pay, the Agreement required Hosting Source to provide Block Mining with monthly cost estimates and reconciliations for what Block Mining owed. (*See id.*)

Because the Rigs remained the exclusive property of Block Mining, the Agreement established several safeguards for Block Mining's property rights that limited Hosting Source's ability to do whatever it wanted with the Rigs. Specifically, Hosting Source had to let Block Mining access the Facility to inspect its Rigs upon 72 hours' written notice (*see id.* at 4, § 2.5); provide Block Mining with VPN access to monitor the activities of its Rigs (*see id.* § 2.7); allow Block Mining to retake possession of its Rigs upon 72 hours' notice upon termination of the Agreement (*see id.* § 2.4); and give Block Mining "immediate and unconditional access" to "modify, protect, or remove" Block Mining's Rigs upon termination of the Agreement (*id.* § 11.3).

**C.    Hosting Source Fails to Live Up to, and Eventually Terminates, the Agreement**

Much of Block Mining's claims center on Hosting Source's chronic failure to supply sufficient electrical power to the Rigs. (*See* Dkt. No. 1, ¶¶ 39–55.)

On November 20, 2023, after Block Mining had repeatedly brought the deficient electrical power to Hosting Source's attention, Hosting Source informed Block Mining it was refusing to renew, and thus terminating, the Agreement as it pertained to 402 of Block Mining's Rigs. (*See id.* ¶ 56.) Block Mining removed these 402 Rigs from the Facility by February 2024. (*See id.* ¶ 56.) Shortly thereafter, Hosting Source informed Block Mining that it was terminating the Agreement as it pertained to the remainder of the Rigs and proposed a staggered removal schedule whereby Block Mining would remove only 300 Rigs every month. (*See id.* ¶¶ 62–63.) Block Mining, however, understood that, if it agreed to the proposed removal schedule, Hosting Source was

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

committing to restore the electrical power to proper levels. (*See id.* ¶¶ 65–68.) But Hosting Source never did increase the electrical power to the levels that were specified in the Agreement. (*Id.*)

**D.   Hosting Source Shuts Off Block Mining's VPN Access**

On March 2, 2024, without providing any notice to Block Mining, Hosting Source unilaterally shut off Block Mining's VPN access to the Rigs. (*See id.* ¶ 69–70.) Without VPN access, Block Mining could not monitor the performance of its Rigs or determine whether Hosting Source was even running them. (*See id.* ¶ 62.) This occurred at a pivotal time, as BTC was trading at record-high prices and the BTC Halving was soon to result in BTC mining becoming much more expensive. (*See id.* ¶ 19.)

After Hosting Source shut off its VPN access, Block Mining, on March 2, 2024, notified Hosting Source that it was sending personnel to the Facility to recover its Rigs. (*See id.* ¶ 74.)[2] On March 5, 2024, two employees of Block Mining travelled from Chicago, Illinois, to the Facility, but Hosting Source refused them access. (*See id.* ¶¶ 75–76.)  Since then, the Complaint alleges that Hosting Source has continued to refuse to allow Block Mining to retake possessions of its Rigs.

**E.   Procedural History**

On March 8, 2024, Block Mining filed its Complaint. (Dkt. No. 1.) On March 29, 2024, Hosting Source filed both (1) a Motion to Dismiss Block Mining's Complaint (Dkt. No. 25) *and* (2) an Answer to Block Mining's Complaint (Dkt. No. 27).[3] In its Motion, Hosting Source seeks to dismiss Block Mining's claims for conversion, trespass to chattels, and permanent injunctive relief. The Conclusion section of Hosting Source's motion asks the Court to dismiss these three claims "with prejudice" but nowhere does Hosting Source argue that amendment would be futile.

---

[2] Critically, the Agreement states that Block Mining "***shall be obligated*** to remove no more than 400" Rigs per month, but nothing precludes it from doing so should it desire; Hosting Source just cannot force it to remove more than that.  (*See* Dkt. No. 5-1, §11.1) (emphasis added).

[3] On April 19, 2024, Block Mining moved to dismiss the counterclaim asserted against it in Hosting Source's Answer. (Dkt. No. 37.)

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

### III.   ARGUMENT

**A.   Legal Standard**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To avoid dismissal, a complaint must contain allegations that "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). While the Court need not accept threadbare recitals of the elements of a cause of action, it must "accept all factual allegations in the complaint and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). Further, "*Twombly* . . . does not prevent a plaintiff from pleadings facts on information and belief where the acts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017). A plaintiff "need not specifically plead facts to which she cannot reasonably be expected to have access" before discovery. *Rubenstein v. Neiman Marcus Grp.*, 687 F. App'x 564, 578 (9th Cir. 2017). Nor can factual issues be resolved at the pleadings stage. *See, e.g.*, *Newcal Indus. Inc. V. Ikon Office Sol.*, 513 F.3d 1038, 1055 (9th Cir. 2008).

Here, taking all of the Complaint's factual allegations as true and drawing all reasonable inferences in favor of Block Mining, it is clear that Block Mining has stated claims for relief on each of its claims: breach of contract, conversion, trespass to chattels, and permanent injunction.

**B.   Block Mining States a Claim for Conversion Because it Specifically Alleges that Hosting Source is Unlawfully Retaining its Mining Rigs and is "using the Rigs . . . to mine BTC for itself"**

Hosting Source makes four arguments for why Block Mining's conversion claim should be dismissed. All of those arguments fail. Block Mining's allegations establish that Hosting Sources willfully interfered with Block Mining's Rigs, "without lawful justification," thereby depriving the rightful owner of possession. *Lenelson v. Wells Fargo Bank, N.A.*, 641 F. Supp. 3d 1005, 1015 (W.D. Wash. 2022).

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

1    **1.    Block Mining is Entitled to "Immediate Possession" of its "Exclusive Property" Under the Plain Text of the Agreement**

Hosting Source is wrong that the parties' Agreement "requires Hosting Source to retain physical possession" of the Rigs (Dkt. 25 at 6), even after the Agreement terminated and Block Mining demanded return of its property. Under Washington law, "[o]ne in possession of a chattel as bailee or otherwise, who on demand, refuses to surrender its possession to another entitled to the immediate possession thereof, is liable for conversion." *Judkins v. Sadler-Mac Neil*, 376 P.2d 837, 839 (Wash. 1962) (citing REST. (1st) TORTS, § 237 (1934)). This is so even if the original possession of that property was authorized. *See United Federation of Churches, LLC v. Johnson*, 598. F. Supp. 3d 1084, 1101 (W.D. Wash. 2022) (citing *id.*) Here, the Agreement specifies that the Rigs are Block Mining's "exclusive property," and that "following the . . . termination of this Agreement, . . . Customer shall be entitled to immediate possession of all Mining Equipment." (Dkt. No. 5-1 at 7, §§ 11.2, 11.3.)

> **11.2**    Except as provided in Section 17.13, following the expiration or termination of this Agreement, all Customer's rights under this Agreement shall terminate and Customer shall be entitled to the immediate possession of all Mining Equipment. If the Agreement is terminated because of a breach of this Agreement by Service Provider then Customer shall be reimbursed for the cost of relocating its Mining Equipment from Service Provider's facility.
>
> **11.3**    If this Agreement is terminated for any reason, upon expiration of this Agreement, or at Customer's option upon cessation of services under this Agreement due to a Force Majeure Event, Service Provider shall provide Customer with immediate and unconditional access to any hosting site(s) in which Service Provider is hosting Customer's Mining Equipment to allow Customer to modify, protect, or remove the Mining Equipment. The Parties agree that, although Service Provider may store, use, or install the Mining Equipment at its hosting site(s), the Mining Equipment is and shall remain the exclusive property of Customer and shall not be deemed to become a fixture of the hosting site(s) or otherwise so related to the hosting site(s) as to give rise to a similar interest to Service Provider under applicable real estate law. Service Provider shall not allow any lien, security interest, or other encumbrance to attach to any of the Mining Equipment, and shall defend and hold Customer harmless from any claim by a third party of any such lien, security interest, or encumbrance. Service Provider shall take all necessary action to effectuate the provisions of this Section, including the grant of access to Customer, notwithstanding any adverse condition of Service Provider, such as bankruptcy or other insolvency proceedings. Service Provider shall immediately notify Customer if any such claim or notice related to the Customer's Mining Equipment is received by Service Provider.

Here, Hosting Source terminated the Agreement, and Block Mining "demanded the return of its property." (Dkt. No. 1, ¶¶4, 87; *see also* Dkt. No. 5-12 at 2.) Accordingly, Hosting Source is contractually obligated to return Block Mining's Rigs and stolen BTC.

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

Contrary to Hosting Source's argument that "property held in trust on Hosting Source's colocation site must comply with contract terms so that Hosting Source is not damaged, and Block Mining is not unjustly enriched" (Dkt. No. 25 at 6-7), the Agreement is explicit that Hosting Source must comply with § 11.3 "notwithstanding any adverse condition of Service Provider," and cannot "allow any lien . . . or other encumbrance" to attach to the Rigs. (Dkt. No. 5-1 at 7, §11.3.) The Agreement does not provide that Hosting Source can hold onto Block Mining's property because returning it would be unprofitable for Hosting Source. Nor does it unjustly enrich Block Mining to return Block Mining's own "exclusive property," when it is "entitled to the immediate possession." (*Id.* at 7, §§ 11.2, 11.3.) And even if the Agreement said anything about holding property "in trust," (and it says nothing about that),[4] unilaterally putting property in a trust when the Agreement entitles Block Mining to immediate possession of that property would still be conversion.[5]

### 2. Nowhere Does the Complaint Allege that Block Mining Consented to Hosting Source's Continued Withholding of the Rigs

Hosting Source's assertion that a "termination agreement" authorized it to keep Block Mining's Rigs ignores Block Mining's allegations in the Complaint and basic principles of contract law. The Complaint specifically alleges that a condition of Block Mining's accepting the removal schedule was that Hosting Source "would increase the power output to the Rigs," and that Hosting Source "again failed to provide Block Mining's Rigs with the appropriate amount of power." (Dkt. No. 1, ¶¶66–68):

---

[4] The only document saying anything about holding property in trust is an email from Hosting Source's *own litigation counsel* to Block Mining's outside general counsel, stating "we will hold funds in trust pending resolution of this dispute." (Dkt. No. 5-10 at 2.) This self-serving assertion from Hosting Source's own lawyers in this case has no legal bearing on whether Block Mining states a claim for conversion, and certainly Block Mining has never alleged that property is in fact being held in trust, nor does Block Mining have any information or belief that that is the case.

[5] Additionally, Hosting Source has never identified a trustee, provided a copy of any trust instrument, or much less provided an accounting of trust property to which Block Mining would be entitled as the beneficiary of the purported trust. Block Mining intends to demand this information.

OPPOSITION MOTION TO DISMISS
C24-0319-JLR – 7

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

66.     On February 15, 2024, Hosting Source ==repeated its representation to Block Mining== ==that it would increase the power output to the Rigs pursuant to a removal schedule== extending through July 2024.

67.     Block Mining ==decided to accept the termination== of its arrangement with Hosting Source and recover its Rigs from the Facility as the terms for each miner expired.

68.     However, Hosting Source again ==failed to provide Block Mining's Rigs with the== ==appropriate amount of power==, instead continuing to run the Rigs at extremely low rates.

That failure constitutes a material breach of the termination schedule, so Block Mining was not required to follow any such schedule.

If, as Hosting Source suggests, it never committed to increasing the electric power to the Rigs as part of Block Mining accepting a modified removal schedule, then the removal schedule was ineffective to modify the plain text of the Agreement. It is hornbook contract law that "[a] modification of an existing contract must be supported by new consideration independent of the consideration involved in the original agreement." *Barnett v. Buchan Baking Co.*, 724 P.2d 1077, 1082 (Wash. Ct. App. 1986) ("Barnett . . . was given no new consideration to modify the time period for which he held the exclusive right to exercise the purchase option. Thus, the extension had no effect on his rights."). Without the promise to increase power to the Rigs, the purported termination schedule was a legal nullity—even if Block Mining accepted it. And at any rate, whether the promise to increase power was or was not part of the proposal for a modified termination schedule is a factual issue inappropriate for resolution at this stage.

Hosting Source also appears to argue that the Agreement limits Block Mining to removing 400 Rigs per month. (Dkt. 25 at 7.) Not so. The Agreement expressly states that, if Hosting Source terminates, then Block Mining "***shall be obligated*** to remove no more than 400 pieces of Equipment per month." (Dkt. No. 5-1 at 6–7, § 11.1). This term sets a cap for how many Rigs Hostin Source can *force* Block Mining to remove. Nothing Precludes Block Mining from removing

as many Rigs as it wants. After all, it is entitled to "immediate possession" upon termination. *Id.*, § 11.2.) .[6]

The foregoing analysis also permits the Court reject Hosting Source's argument that Block Mining's conversion claim is not "ripe" because the Rigs are supposedly "in trust," and the removal schedule dates have not yet passed. (Dkt. No. 25 at 7.) The removal schedule is a legal nullity, either due to Hosting Source's material breach or lack of a valid contract. And even if the Court were to accept Hosting Source's outside-the-pleadings assertion that it is holding the Rigs "in trust," converting property by putting it in a trust is still conversion.[7]

### 3.    Block Mining's Conversion Claim is Based On Hosting Source Unlawfully Withholding the Rigs and Misappropriating the BTC Those Rigs Are Mining.

Hosting Source argues there "has been no conversion of any monetary arrangements" because "[t]here are no facts alleging [sic] that Hosting Source is wrongfully benefitting by holding the computers or assets of the mining." (*Id.* at 8.) This argument fails for three reasons.

First, the rule that there is no claim for conversion of cash unless the cash is "wrongfully received" does not apply because Block Mining is suing for conversion of the Rigs and of BTC mined by the Rigs—not cash.

Second, the Agreement's 80/20 profit share expressly contemplates that Block Mining will receive *all* BTC mining proceeds, conduct a reconciliation, and *then* pay the 20% split to Hosting Source. (*See* Dkt. 5-1 at 5,  6 ("Customer will provide a reconciliation of Generated Digital Assets to determine the Net Mining Reward (net profit) *for the prior month*. Such Net Mining Reward shall be allocated 80% to Customer and 20% to Service Provider, and the 20% shall *then* be paid

---

[6] Hosting Source also appears to argue that, by demanding its Rigs, Block Mining is "deliberately seeking unjust enrichment."  (Dkt. No. 25 at 7.) Hosting Source has not asserted a claim for unjust enrichment, and by seeking property that belongs to it, Block Mining is not seeking any unjust enrichment, but merely the property that it is entitled to.

[7] Additionally, the only document in record that mentions holding any property "in trust" is an email from Hosting Source's own litigation counsel saying "we will hold **funds** in trust pending resolution of this dispute." (Dkt. No. 5-10 at 2) (emphasis added). It says nothing about the Rigs themselves.

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

1   to Service Provider with Customer *retaining* the 80% portion.").). The structure and syntax of § 6

2   of the Agreement makes clear that Hosting Source is not allowed to just keep all the mining

3   proceeds or even to keep its 20% split. Rather, Block Mining pays that amount retroactively based

4   on the reconciliation process.

5   Third, despite Hostin Source's assertion, Block Mining indeed alleges that Hosting Source

6   is wrongfully benefitting by holding onto the Rigs. Ignoring for a moment that whether a tortfeasor

7   wrongfully benefits from retaining converted property is not an element a plaintiff must prove to

8   establish conversion, the Complaint asserts that "[u]pon information and belief, Hosting Source

9   has either turned the Rigs off altogether or, despite its representations, may be using the Rigs

10   without permission or approval from Block Mining to mine BTC for itself, effectively stealing

11   Block Mining's property." (Dkt. 1, ¶4.) Block Mining sufficiently alleges its conversion claim and

12   is entitled to take discovery on this claim.

13   **C.   Block Mining States A Claim for Trespass To Chattels Because Hosting Source Has—**
**For Almost Two Months—Prevented Block Mining From Accessing Its Rigs.**
14

15   Hosting Source argues that it did not commit trespass to chattels because it breached only

16   contractual duties, not tort ones; it was not required to let Block Mining access the Rigs; and Block

17   Mining "cannot prove" damages. (Dkt. No. 25 at 8–10.) Hosting Source is wrong, and these

18   arguments all fail.[8]

19   **1.   Hosting Source Breached a Tort Law Duty by Intentionally Interfering with**
**Block Mining's Possessory Interest in the Rigs.**

20   While it was certainly a breach of the Agreement for Hosting Source to remove Block

21   Mining's VPN access to monitor the Rigs, a biproduct of that breach was Hosting Source's

22   violation of its duty not to interfere with Block Mining's property interest in the Rigs. Washington

23   courts recognize that a plaintiff can recover in tort "when the defendant's alleged misconduct

24   ─────────────

25   [8] Hosting Source states that "[f]or the sake of brevity, all arguments pertaining to conversion are
incorporated by reference herein [*i.e.*, in the section of its brief discussing the trespass to chattels
26   claim]." (Dkt. No. 25 at 9.) To the extent Hosting Source makes the same arguments on Block
Mining's trespass to chattels claim as it does on the conversion claim, those arguments fail for the
same reasons described in the section of this opposition brief addressing the conversion claim.

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

1   implicates a tort duty that arises independently of the terms of the contract." *Eastwood v. Horse*

2   *Harbor Found., Inc.*, 241 P.3d 1256, 1264 (Wash. 2010). Even if harm arises from a contractual

3   breach, it is possible that "the harm is simultaneously the result of the defendant's breaching an

4   independent *and concurrent* tort duty." *Id.* (emphasis added). Where, as here, "a defendant has

5   obligations under both the contract terms and an independent tort duty," the issue of

6   "distinguishing between a harm that implicates only the contract and a harm that implicates the

7   independent duty as well" is "a factual question of proximate causation." *Id.* at 1265.

8         Here, when Hosting Source unilaterally removed Block Mining's VPN access, it breached

9   a term of the Agreement requiring Hosting Source to provide VPN access. But it also breached its

10  tort law duty not to prevent Block Mining from accessing its own property. That conduct amounts

11  to trespass to chattels. *See Fuji Food Prods., Inc. v. Occidental, LLC*, 2018 WL 6310090, at *6–7

12  (Wash. Ct. App. 2018) (unpublished) (holding that "the duty not to steal someone else's property

13  is related to, but independent of, any duties in the parties' lease," and "[b]ecause the parties did

14  not agree contractually that ownership of the cooler rooms would transfer to Occidental, the duty

15  not to convert Fuji's property arouse outside of the four corners of their agreement.").

16        Hosting Source is of course liable for damages resulting from its revocation of VPN access.

17  But it is also liable for damages resulting from its obstruction of Block Mining's access to its own

18  chattels—namely the Rigs and the BTC the Rigs were or are mining.

19        **2.**    **Nothing in the Agreement or in the Law of Torts Allows Hosting Source to**

20                    **Deny Block Mining Access to Its Own Property Just Because the Parties Are Involved in a Dispute.**

21        Hosting Source argues that—even though the Agreement says it "***shall*** permit Customer

22  to retake possession of the Mining Equipment within 72 hours of notice" and says that it "***must***

23  accommodate physical access request[s] within 72 hours' of receipt" (Dkt. No. 5-1 at 4, §§2.4,

24  2.5)—Hosting Source could refuse to grant access because the circumstances had become

25  "contentious." (Dkt. No. 25 at 9–10.) In addition to relying on documents outside the scope of the

26  proper 12(b)(6) record, Hosting Source cites no authority for the idea that the foreseeability of

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

litigation is a defense to a trespass-to-chattels claim or that conduct which otherwise would be a trespass to chattels is not tortious if it is "reasonable." (*See id.* at 9 ("[T]o the extent that access is deemed refused [after Block Mining gave 72 hours' notice of physical inspection], that refusal is reasonable under the circumstances . . . .").) The Rigs are Block Mining's exclusive property. The Agreement gives Block Mining an unqualified right to access its exclusive property upon 72 hours' notice. Receiving a litigation hold notice (which is not properly part of the record at this stage) may suggest that litigation is foreseeable. But it does not suspend Hosting Source's duties under the Agreement or modify the Agreement's plain text. Hosting Source received adequate notice of the request for physical access and simply refused to comply. This conduct barred Block Mining from accessing or retrieving its property and is thus a trespass to chattels.

### 3.   Hosting Source's Argument that "Block Mining Cannot Prove Damages" is Inapposite Because a Claim for Trespass to Chattels Seeks Redress for Injury to a Property Interest.

Hosting Source argues that Block Mining cannot sue for trespass to chattels because Block Mining does not allege that Hosting Source's dispossessing Block Mining of the Rigs proximately caused "monetary damages." (Dkt. No. 25 at 10.) This argument does not make sense. Block Mining's trespass-to-chattels claim seeks redress for an interference with Block Mining's possessory right to personal property—the Rigs, not for any specific monetary losses. Hosting Source indeed harmed Block Mining economically, but that is not at issue in the trespass-to-chattels claim. It is black letter tort law that damages for "harm to chattels not amounting to a total destruction in value" include compensation for "(a) the difference between the value of the chattel before the harm and the value after the harm . . . , and (b) ***the loss of use***." REST. (2d) TORTS, § 928 (1979) (emphasis added). Where a tortfeasor prevents someone from using chattels, the damages include "the value of use during the period of detention or prevention [of use] or the value of the use of or amount paid for a substitute." *Id.* § 931; *see also McCurdy v. Union Pac. Rwy. Co.*, 413 P.2d 617, 622–25 (Wash. 1966) (setting forth the test for measuring damages for harms to personal property, which includes damages for loss of use).

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

1    Hosting Source argues that Block Mining's allegations "indicate" ongoing mining

2    activities such that "Block Mining still reaps the profits." (Dkt. No. 25 at 10.) But Hosting Source

3    again ignores Block Mining's allegation that Hosting Source has either "turned the Rigs off

4    altogether" or is "using the Rigs without permission or approval from Block Mining to mine BTC

5    for itself, effectively stealing Block Mining's property." (Dkt. 1, ¶4.) And Hosting Source cannot

6    argue that Block Mining's allegations of damages are insufficient when Hosting Source itself has

7    denied Block Mining the access it would need to in order to provide more detail about how Hosting

8    Source has been misusing the Rigs.

9    Moreover, Block Mining need not "prove" damages at the pleadings stage. "To satisfy the

10   federal rules, a plaintiff need not specify his damages in detail, so long as his prayer for relief fairly

11   encompasses the damages sought." *Burdick v. Bank of Am. N.A.*, 99 F. Supp. 2d 1372, 1380 (S.D.

12   Fla. 2015). Block Mining's claim is not that Hosting Source exposed it to market price volatility

13   by failing to let Block Mining access, monitor, or retrieve its own property. Rather, Block Mining

14   alleges that Hosting Source trespassed to Block Mining's chattels by obstructing Block Mining's

15   ability to exercise its right to access and use that property. Block Mining is entitled to recover the

16   value of the lost access and use, whatever that amount may be after conducting discovery.

17   **D.    Dismissing Block Mining's Request to Pursue Injunctive Relief Would be Premature**

18   To be entitled to a permanent injunction, a party must first succeed on the merits of the

19   claim. *See, e.g.*, *Penwell v. Obenland*, 2016 WL 7736954, at *6 (W.D. Wash. 2016). A plaintiff

20   seeking a permanent injunction must also demonstrate: (1) an irreparable injury; (2) the absence

21   of an adequate available remedy at law, such as monetary damages; (3) that, considering the

22   balance of hardships, an equitable remedy is warranted; and (4) that the public interest would not

23   be disserved by a permanent injunction. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391

24   (2006). Block Mining's claim for a permanent injunction will remain ripe until Hosting Source

25   has returned all of the Rigs and any other property of Block Mining it may be retaining. Block

26   Mining is entitled to litigate the merits of its claim for permanent injunction, to take full discovery

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

on its claims, and to ask the Court for equitable relief. For this reason, the claim for permanent injunction is ripe, and must not be dismissed.

**E.    In the Alternative, the Court Should Direct Block Mining to File an Amended Complaint Rather than Dismiss any Claims that the Court Believes are Deficient as Pled.**

The discussion above shows that Block Mining's Complaint, as currently plead, survives Hosting Source's Motion. But if the Court is inclined to dismiss any part of the Complaint, Block Mining respectfully asks that the Court instead direct it to file an amended Complaint.[9] Block Mining has discovered new information since filing its Complaint that, Block Mining believes, fits within the scope of the claims it has already pleaded, but that reinforces the position articulated in this opposition brief.

Specifically, on April 3, 2024 (after this action was filed and after Hosting Source filed its Motion), Hosting Source permitted Block Mining to remove 400 of the Rigs from the Facility pursuant to the disputed removal schedule discussed above.[10] With these Rigs back in its possession, Block Mining analyzed their operating histories since March 2, 2024 and learned that Hosting Source has indeed been diverting BTC mining proceeds to itself. This analysis has confirmed what Block Mining could only allege "upon information and belief" in the Complaint: that Hosting Source is "using the Rigs without permission or approval from Block Mining to mine BTC for itself, effectively stealing Block Mining's property." (Dkt. No. 1, ¶4.)

---

[9] "A party may amend its pleading with the court's leave which "the court should freely give . . . when justice so requires." *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1102 (9th Cir. 2018) (quoting Fed. R. Civ. P. 15(a)(2)). "This policy is to be applied with extreme liberality." *Id.*; *see also Unified Data Servs., LLC v. Fed. Trade Comm'n*, 39 F.4th 1200, 1208 (9th Cir. 2022) ("We acknowledge, of course, that we have repeatedly instructed that leave to amend should be given, even sua sponte, if amendment could cure a pleading defect.").

[10] Block Mining removed these Rigs because it allowed Block Mining to recover at least some of its Rigs and—hopefully—to mitigate its damages. Block Mining did so while explicitly preserving, and in no way waiving, its position that the removal schedule is ineffective, and Block Mining made clear to Hosting Source that the removal of these Rigs should not be construed as an acceptance by Block Mining as to the removal schedule. Block Mining has reserved and continues to reserve its rights to proceed with this action and recover all damages to which it is entitled.

OPPOSITION MOTION TO DISMISS
C24-0319-JLR – 14

1    Block Mining respectfully submits that these facts are already encompassed within the

2  theories of liability asserted in its existing pleading to give Hosting Source sufficient notice of the

3  claims against it. But if the Court is inclined to disagree, Block Mining respectfully requests the

4  opportunity to firm up those allegations based on its recent analysis.

5                                    **IV.    CONCLUSION**

6        For the foregoing reasons, Plaintiff Block Mining respectfully requests that the Court deny

7  Defendant Hosting Source's Motion.

8        DATED this 22nd day of April 2024.

9                                         MCDERMOTT WILL & EMERY LLP

10                                        I certify that this memorandum contains
                                          5,273 words, in compliance with the Local
11                                        Civil Rules.

12                                        By: *s/ Daniel-Charles V. Wolf*
                                          Daniel-Charles V. Wolf, WSBA #48211

13                                        444 W. Lake St., Ste. #4000
14                                        Chicago, IL 60606-0029
                                          (312) 372-2000
15                                        dcwolf@mwe.com

16                                        Joseph B. Evans, ADMITTED *PRO HAC VICE*
                                          M. Elias Berman, ADMITTED *PRO HAC VICE*
17                                        One Vanderbilt Avenue
                                          New York, NY 10017-3852
18                                        (212) 547-5400
                                          jbevans@mwe.com
19                                        eberman@mwe.com

20                                        *Attorneys for Plaintiff*

21

22

23

24

25

26

OPPOSITION MOTION TO DISMISS
C24-0319-JLR – 15

MCDERMOTT WILL & EMERY
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000