1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   BLOCK MINING, INC.,                        CASE NO. C24-0319JLR

11                          Plaintiff,           ORDER

12           v.

13   HOSTING SOURCE, LLC,

14                          Defendant.

15                          **I.   INTRODUCTION**

16           Before the court is Defendant / Counterclaimant Hosting Source, LLC's ("Hosting

17   Source") motion to dismiss Plaintiff / Counter-Defendant Block Mining, Inc.'s ("Block

18   Mining") claims for conversion, trespass to chattels, and a permanent injunction.  (Def.

19   MTD (Dkt. # 25); Def. Reply (Dkt. # 40); *see also* Compl. (Dkt. # 1).)  Block Mining

20   opposes Hosting Source's motion.  (Pl. Resp. (Dkt. # 38).)  Also before the court is Block

21   Mining's motion to dismiss Hosting Source's breach of contract counterclaim.  (Pl. MTD

22   (Dkt. # 37); Pl. Reply (Dkt. # 47); *see also* Answer (Dkt. # 27).)  Hosting Source opposes

Block Mining's motion.  (Def. Resp. (Dkt. # 46).)  The court has reviewed the motions, the parties' submissions in support of and in opposition to the motions, the relevant portions of the record, and the governing law.  Being fully advised,[1] the court GRANTS in part and DENIES in part Hosting Source's motion and GRANTS Block Mining's motion.

## II.   BACKGROUND

This dispute arises between two entities engaged in the business of mining Bitcoin, a cryptocurrency.  The court provides background information on Bitcoin and cryptocurrencies in general before setting forth the relevant factual background, as pleaded by the parties, and the procedural history of this case.

### A.   Bitcoin Background

Bitcoin ("BTC") is a popular cryptocurrency.  (Compl. (Dkt. 1) ¶ 12.)  Block Mining describes cryptocurrencies as "digital assets" that, like any other currency, "hold value and can be used to buy goods and services."  (*Id.*)  All cryptocurrencies exist on a "blockchain," which "is an open-sourced string of code" comprising "the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency."  (*Id.* ¶ 13.)  When consumers transact in cryptocurrency, those transactions are validated on the blockchain in batches, known as "blocks."  (*Id.* ¶ 14.)  The blockchain is publicly available and reflects all of the "blocks" of validated

---

[1] Hosting Source requests oral argument and Block Mining does not.  (*See* Def. MTD at 1; Pl. MTD at 1.)  The court concludes that oral argument would not aid in its disposition of the motions.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

1    transactions that occurred at a particular point in time, ordered by date in a "chain"—

2    hence, "blockchain."  (*Id.* ¶ 15.)  BTC is a "decentralized, open-source, and peer-to-peer

3    cryptocurrency."  (*Id.* ¶ 16.)  In other words, there is no single central authority that

4    regulates BTC; instead, the public controls the supply of and validates transactions in

5    BTC.  (*Id.*)  This process of validating transactions in BTC and thereby creating new

6    BTC is known as "mining."  (*Id.* ¶ 17.)  BTC miners use high-powered computers,

7    commonly known as "rigs," to solve complex cryptographic puzzles on the BTC

8    network.  (*Id.* ¶ 17.)  By solving the puzzle, the miner validates a BTC transaction,

9    creates a new block in the blockchain, and unlocks newly minted BTC.  (*Id.* ¶¶ 17-18.)

10   Newly minted BTC is awarded to successful miners in order to generally incentivize

11   participation in the validation of BTC transactions.  (*Id.* ¶ 18.)  At the time Block Mining

12   initiated this lawsuit, the reward for mining one block was 6.25 BTC.[2]  (*Id.*)

13          Because BTC was "designed with scarcity as a central feature," there is only a

14   limited amount of BTC on the cryptocurrency market and available to be mined.  (*Id.*

15   ¶ 19.)  All together, there exists a maximum supply of 21 million BTC.  (*Id.*)

16   Approximately 19 million BTC has already been mined, leaving just 2 million remaining

17   to be mined.  (*Id.*)  To ensure scarcity and prevent inflation, the BTC network also

18   executes "a periodic Bitcoin-halving event" every time that 210,000 BTC blocks have

19   been mined, or approximately once every four years.  (*Id.*)  The Bitcoin Halving reduces

20

21          [2]  As of this writing, Bloomberg values 1 BTC at $66,661.63 USD.  *BXBT-USD Cross
     Rate*, Bloomberg, https://www.bloomberg.com/quote/XBTUSD:CUR (last visited June 13,
22   2024).

ORDER - 3

1  the reward for mining BTC by half.  (*Id.*)  The most recent halving event occurred on

2  April 19, 2024[3] and reduced the reward for mining one block to 3.125 BTC, making it

3  comparatively more expensive to mine a single BTC.  (*See id.*)

4    As Block Mining explains, "crypto mining is an extremely competitive and

5  difficult industry in which to operate."  (*Id.* ¶ 20.)  One challenge is that BTC mining

6  requires significant computer power, which is measured "in terms of a 'hash rate.'"  (*Id.*

7  ¶ 24; *see also id.* ¶¶ 17, 21-23.)  The "hash rate" is "oftentimes expressed in terms of

8  PetaHash per second ('PH/s')."  (*Id.* ¶ 24.)  Rigs can operate at varying power levels; the

9  higher the hash rate, "the more BTC the Rigs are able to mine over time."  (*Id.* ¶ 47.)  The

10  rise of BTC and the challenges that come with mining it have spawned an entire

11  pseudo-industry of mining-related services known as "colocation services."  (*See id.*

12  ¶¶ 20-23.)  These services typically involve "hous[ing] large numbers of rigs dedicated to

13  mining cryptocurrencies every hour of every day, . . . monitoring electricity costs,

14  providing the facility with the appropriate temperature for rigs to operate, and ensuring

15  that rigs maintain internet connectivity to participate in cyptocurrency mining."  (*Id.*

16  ¶¶ 21-22.)  The instant dispute stems from a contract between Block Mining and Hosting

17  Source for the provision of these colocation services.  (*Id.* ¶¶ 1-2.)

18  //

19  //

20

21

22

---

[3] Patrick McGimpsey, *Bitcoin Halving 2024: Not with a Bang, but a Whimper*, Forbes Advisor (Apr. 20, 2024), https://www.forbes.com/advisor/investing/cryptocurrency/bitcoin-halving-2024/.

ORDER - 4

**B.      The Contract and the Fallout**

In July 2021, Block Mining and Hosting Source entered into a Colocation Mining Services Agreement (the "Agreement") with respect to 1,610 rigs (the "Rigs") that Block Mining had purchased from a third party for approximately $6,400,000.  (*Id.* ¶¶ 1-2, 25-26; *see also* Marchiori Decl. (Dkt. # 5) ¶ 20 & Ex. A (Dkt. # 5-1) ("Agreement").)  Hosting Source agreed to house and operate the Rigs at its mining facility located in East Wenatchee, Washington (the "Facility").[4]  (Compl. ¶ 26.)  Under the Agreement, Hosting Source was to install the Rigs and power them at a hash rate of 141.704 PH/s, allowing the Rigs to efficiently perform cryptographic functions and mine BTC.  (*Id.* ¶¶ 26-28; *see also* Agreement, Ex. A §§ 1.8, 4, Exs. B-C.)  The Agreement also provided Block Mining with certain physical and remote VPN access rights so it could monitor and inspect its Rigs.  (Compl. ¶¶ 30-32; *see also* Agreement, Ex. A §§ 2.5, 2.7.)  In exchange for colocation services, Hosting Source earned a portion of the BTC rewards generated by Block Mining's Rigs at the Facility.  (Compl. ¶¶ 34-35; *see also* Agreement, Ex. A § 6.)

In early 2023, Hosting Source received notice from third party lender NYDIG ABL, LLC ("NYDIG") that Block Mining had defaulted on its loan obligation with respect to the Rigs.  (Compl. ¶ 39.)  Thereafter, Hosting Source began reducing the power ouput to Block Mining's Rigs.  (*Id.* ¶¶ 43-44.)  Block Mining cured the delinquency by February 28, 2023.  (*Id.* ¶ 41.)  Nevertheless, Hosting Source continued to operate the

---

[4]  Block Mining ultimately delivered 1,508 Rigs to the Facility for colocation services. (Marchiori Decl. ¶ 20.)  Although this fact is not alleged in the complaint, the court includes it here for clarity purposes.  (*See generally* Compl.)

1    Rigs on "low power mode" despite Block Mining's requests to restore them to full power

2    as set forth in the Agreement.  (*Id.* ¶¶ 51-55.)  This was concerning to Block Mining,

3    because by placing a miner in low power mode, the miner does not hash at its highest

4    rate, thereby decreasing the amount of BTC that is mined on any given day.  (*See id.*

5    ¶¶ 46-51.)  According to Block Mining, the loan arrangement had no bearing on the

6    Agreement and Hosting Source therefore had no right to reduce the power output.  (*See*

7    *id.* ¶ 45.)  Yet Hosting Source kept Block Mining's Rigs running at low power,

8    continuing to cite the unrelated loan as cause to do so.  (*See id.* ¶¶ 42, 52-55.)  Block

9    Mining asserts that, during this time, Hosting Source was "redirecting power to its own or

10   other customers['] miners that [were] more profitable to Hosting Source."  (*Id.* ¶ 44.)

11        In November 2023, Hosting Source elected to terminate the Agreement with

12   respect to 402 Rigs and the parties arranged for their removal, which was completed by

13   January 2024.  (*Id.* ¶¶ 56-60.)  Block Mining consented to the removal on the

14   understanding that Hosting Source would restore full power to the remaining 1,106 Rigs.

15   (*Id.* ¶ 60.)  Block Mining alleges Hosting Source never restored the remaining Rigs to full

16   power and instead terminated the Agreement entirely.  (*Id.* ¶¶ 60-62.)

17        Hosting Source proposed a schedule to remove the remaining Rigs in batches over

18   the course of several months through July 2024, citing a provision of the Agreement that

19   states:  "In the event of any termination by [Hosting Source], [Block Mining] shall be

20   obligated to remove no more than 400 pieces of Equipment per month."  (Agreement, Ex.

21   A § 11.1; Compl. ¶¶ 63, 66.)  Block Mining initially agreed to this proposal based on

22   Hosting Source's representations that it would restore the remaining Rigs to full power

1  until all of the Rigs could be removed from the Facility.  (Compl. ¶¶ 65-67.)  But soon

2  thereafter, Hosting Source demanded that Block Mining pay it $278,242.41 in claimed

3  fees, "completely and unilaterally" shut down Block Mining's Rigs, and removed Block

4  Mining's VPN access, preventing Block Mining from monitoring its Rigs.  (*Id.* ¶¶ 69-71.)

5  Block Mining refused to pay, denying that it owed any fees to Hosting Source.  (*See id.*

6  ¶¶ 71-72.)  Hosting Source maintains that "Block Mining failed to timely pay all monies

7  due and owing to Hosting Source."  (Answer ¶ 1.10.)

8      On March 2, 2024, Block Mining informed Hosting Source that it intended to

9  retake possession of all of the Rigs beginning on March 5, 2024, citing a provision of the

10  Agreement that states: "Upon Termination of this Agreement for any reason, [Hosting

11  Source] shall permit [Block Mining] to retake possession of the Mining Equipment

12  within 72 hours notice."  (Agreement, Ex. A § 2.4; Compl. ¶¶ 73-74.)  Block Mining

13  representatives traveled from Chicago, Illinois to East Wenatchee, Washington on March

14  5 to collect the Rigs, but arrived to a deserted Facility "with no signs of personnel."

15  (Compl. ¶¶ 75-76.)  Block Mining was unable to recover its Rigs.  (*See id.* ¶¶ 1, 77.)

16  **C.    Procedural History**

17      Block Mining filed this lawsuit on March 8, 2024, raising claims for breach of

18  contract, conversion, trespass to chattels, and a permanent injunction.  (*Id.* ¶¶ 78-100.)

19  Block Mining alleges that "Hosting Source has either turned the Rigs off altogether or,

20  despite its representations, may be using the Rigs without permission or approval from

21  Block Mining to mine BTC for itself, effectively stealing Block Mining's property."  (*Id.*

22  ¶ 4.)  Concurrently with its complaint, Block Mining filed an emergency motion for a

1   temporary restraining order ("TRO") and preliminary injunction, arguing that Hosting

2   Source was holding its Rigs "hostage" at a critical time in the Bitcoin mining industry—

3   just one month before the Bitcoin Halving.  (TRO Mot. (Dkt. # 2) at 1.)  The court denied

4   the motion, concluding Block Mining failed to show a likelihood of irreparable harm

5   because the alleged harm was purely economic and could thus be remedied by monetary

6   damages.  (3/18/24 Order (Dkt. # 20) at 13.)

7           On March 29, 2024, Hosting Source took the somewhat unusual step of filing both

8   a motion to dismiss and an answer to the complaint.  (*See generally* Def. MTD; Answer.)

9   In its motion, Hosting Source argues Block Mining fails to state a claim for conversion,

10  trespass to chattels, and a permanent injunction.  (*See generally* Def. MTD.)  In its

11  answer, Hosting Source asserts a breach of contract counterclaim based on Block

12  Mining's alleged failure to pay all amounts due under the Agreement.  (Answer

13  ¶¶ 1.1-1.17.)  On April 19, 2024, Block Mining moved to dismiss the counterclaim based

14  on lack of subject matter jurisdiction and the failure to state a claim.  (*See generally* Pl.

15  MTD.)  The motions are now ripe for decision.

16                          **III.    ANALYSIS**[5]

17          Below, the court sets forth the relevant legal standards before turning to the

18  parties' motions.

19

20          [5]  As an initial matter, Hosting Source asks the court to consider several documents not
    attached to the complaint in ruling on its motion to dismiss.  (Def. MTD at 4-6.)  "As a general
21  rule, 'a district court may not consider any material beyond the pleadings in ruling on a Rule
    12(b)(6) motion" without converting the motion into one for summary judgment.  *Lee v. City of*
    *Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (quoting *Branch v. Tunnell*, 14 F.3d 449, 453
22  (9th Cir. 1994)).  Nevertheless, in ruling on a motion to dismiss, a court may properly consider

1    **A.    Legal Standards**

2        Subject matter jurisdiction is a threshold issue that goes to the court's power to

3    hear a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). Federal

4    Rule of Civil Procedure 12(b)(1) allows a party to seek dismissal of a claim for lack of

5    subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). When subject matter jurisdiction is

6    challenged, the party asserting that jurisdiction exists bears the burden of proof. *Vacek v.*

7    *U.S.P.S.*, 447 F.3d 1248, 1250 (9th Cir. 2006).

8        In addition, Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when

9    a complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P.

10   12(b)(6); *see also* Fed. R. Civ. P. 8(a)(2) (requiring the plaintiff to provide "a short and

11   plain statement of the claiming showing that the pleader is entitled to relief"). Under this

12   standard, dismissal is proper when there is either a "lack of a cognizable legal theory or

13   the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v.*

14   *Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). The court must construe the

15   allegations in the light most favorable to the nonmoving party, *Livid Holdings Ltd. v.*

16   *Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005), but need not accept as

17   _____

18   material "not physically attached to the complaint" if the documents' authenticity is not
     contested and the plaintiff's complaint necessarily relies on them. *Id.* (reviewing the district
     court's decision to consider extrinsic material for abuse of discretion). The court agrees with

19   Hosting Source that the court may properly consider the Agreement in ruling on the instant
     motions, as the complaint necessarily relies upon the Agreement and neither party contests its

20   authenticity. (*See generally* Compl.; *see also* Def. MTD at 4-6; Pl. Resp. at 2 n.1 ("While Block
     Mining has no objection to Hosting Source citing documents that Block Mining has already

21   placed in the record . . . Hosting Source's submittion of additional documents outside the
     pleadings is improper."); Agreement (filed by Block Mining).) But the court, in its discretion,

22   declines to consider the remaining documents at this juncture and will instead limit its review to
     the pleadings and the Agreement.

1 | true legal conclusions, "formulaic recitation[s] of the legal elements of a cause of action,"

2 | *Chavez v. United States*, 683 F.3d 1102, 1008 (9th Cir. 2012), or "allegations that are

3 | merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Sprewell*

4 | *v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  Although the pleading

5 | standard announced by Federal Rule of Civil Procedure 8 does not require "detailed

6 | factual allegations," it demands more than "an unadorned, the-defendant-unlawfully

7 | harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see*

8 | *also* Fed. R. Civ. P. 8(a).  "[A]ll the Rules require is a short and plain statement of the

9 | claim' that will give the defendant fair notice of what the plaintiff's claim is and the

10 | grounds upon which it rests.'"  *Yamaguchi v. U.S. Dep't of the Air Force*, 109 F.3d 1475,

11 | 1481 (9th Cir. 1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

**B.**   **Hosting Source's Motion to Dismiss**

Hosting Source moves to dismiss Block Mining's claims for conversion, trespass

to chattels, and a permanent injunction pursuant to Rule 12(b)(6).  The court concludes

that Block Mining's tort claims meet minimum pleading standards, but that its claim for a

permanent injunction must be dismissed with prejudice.

1.   Conversion

"Conversion is the unjustified, willful interference with a chattel which deprives a

person entitled to the property of possession."  *In re Marriage of Langham & Kolde*, 106

P.3d 212, 218 (Wash. 2005) (quoting *Meyers Way Dev. Ltd. P'ship v. Univ. Sav. Bank*,

910 P.2d 1308, 1320 (Wash. Ct. App. 1996)); *see also id.* ("A chattel is '[a]n article of

personal property, as distinguished from real property.  A thing personal and moveable.'"

1   (quoting *Chattel*, Black's Law Dictionary (6th ed. 1990))).  "Conversion involves three

2   elements:  (1) willful interference with chattel belonging to the plaintiff, (2) by either

3   taking or unlawful retention, and (3) thereby depriving the owner of possession."[6]

4   *Burton v. City of Spokane*, 482 P.3d 968, 970 (Wash. Ct. App. 2021).  Relevant here,

5   "[o]ne in possession of a chattel as bailee or otherwise, who on demand, refuses to

6   surrender its possession to another entitled to the immediate possession thereof, is liable

7   for its conversion."  *Judkins v. Sadler-Mac Neil*, 376 P.2d 837, 839 (Wash. 1962)

8   (quoting Restatement (First) of Torts § 237 (Am. L. Inst. 1934)).

9        Block Mining's conversion claim is straightforward:  Block Mining alleges

10  Hosting Source, as bailee, converted the Rigs—Block Mining's exclusive personal

11  property—by refusing to surrender them upon Block Mining's demand for their

---

[6] In its reply brief, Hosting Source confidently but incorrectly asserts that "[i]t has been long held in the State of Washington that ***intent to deprive*** the owner of its chattel is integral to recovering on a claim of conversion."  (Def. Reply at 7 (emphasis in original) (citing *Spokane Grain Co. v. Great N. Express Co.*, 104 P. 794, 796 (Wash. 1909)).)  In fact, the opposite is true: it is well-established in Washington that "[w]rongful intent is not an element of conversion, and good faith is not a defense."  *Brown ex rel. Richards v. Brown*, 239 P.3d 602, 610 (Wash. Ct. App. 2010); *see also Clapp v. Johnson*, 57 P.2d 1235, 1236 (Wash. 1936) (holding defendant "was nevertheless guilty of conversion" despite "act[ing] in good faith and without a willful intent to convert").  Hosting Source's cited authority, *Spokane Grain Co.*, cannot reasonably be read to support the proposition that intent is an essential element of conversion in Washington. *Spokane Grain Co.* merely instructs that, "[w]here there is no unlawful taking or exercise of dominion over a chattel," a conversion action cannot lie.  104 P. at 796 (rejecting conversion claim for the value of two horses injured in defendant's care during cross-country transport, concluding "there [was] no unlawful taking or exercise of dominion over" the horses and plaintiff's claims sounded more appropriately in negligence or breach of contract).  Defense counsel is reminded of the ethical duty of candor toward the tribunal under RPC 3.3.  *See* Washington Rules of Professional Conduct RPC 3.3, Comment 2 ("[T]he lawyer must not allow the tribunal to be misled by false statements of law or fact evidence that the lawyer knows to be false."); *see also* Local Rules W.D. Wash LCR 83.3(a)(2) (requiring "attorneys appearing in this district [to] be familiar with and comply with . . . [t]he Washington Rules of Professional Conduct").  Gross misstatements of the law will not be tolerated, and may result in sanctions in the future.

ORDER - 11

1    immediate repossession pursuant to the terms of the Agreement.  (*See* Compl. ¶¶ 73-77,

2    85-91; Pl. Resp. at 6-7; *see also* Agreement, Ex. A §§ 11.2 (providing that upon

3    "termination of this Agreement . . . [Block Mining] shall be entitled to the immediate

4    possession of all Mining Equipment"), 11.3 (stating that the Rigs "shall remain the

5    exclusive property of [Block Mining]" and requiring Hosting Source, upon termination of

6    the Agreement for any reason, to "provide [Block Mining] with immediate and

7    unconditional access to" the Facility "to allow [Block Mining] to modify, protect, or

8    remove the [Rigs]").)  These allegations, when taken as true, state a plausible conversion

9    claim under *Judkins*, 376 P.2d at 839.

10          Hosting Source argues that Block Mining's conversion claim must be dismissed

11   for three principal reasons.  The court is not persuaded.

12          First, Hosting Source argues Block Mining's conversion claim fails because

13   "[t]here has been no conversion of any monetary arrangements."  (Def. MTD at 7-8

14   (citing *Davenport v. Wash. Educ. Ass'n*, 197 P.3d 686, 698 (Wash. Ct. App. 2008)

15   (stating that the law "treats money as a chattel only if the defendant wrongfully received

16   the money or was under obligation to return the specific money to the party claiming it"

17   (internal quotation marks omitted)).)  This argument misapprehends the alleged

18   conversion.  Nowhere in the complaint does Block Mining claim that Hosting Source

19   converted money.  (*See generally* Compl.)  Rather, at issue is Hosting Source's alleged

20   conversion of Block Mining's Rigs, which are personal property items not subject to

21   special rules governing the conversion of monies.  (*Id.* ¶¶ 85-91.)

22   //

1          Second, Hosting Source asserts that Block Mining "cannot satisfy the [conversion]

2    elements when it willingly agreed to, and required, Hosting Source to physically take

3    custody and care of the computers" by entering into the Agreement.  (Def. MTD at 7.)

4    But Block Mining's initial consent to Hosting Source's custody of the Rigs does not bar a

5    conversion claim because a bailee may be liable for conversion under the circumstances

6    alleged here, where the bailee, "on demand, refuses to surrender its possession to another

7    entitled to the immediate possession thereof."  *Judkins*, 376 P.2d at 839.

8          Third, Hosting Source argues Block Mining fails to state a conversion claim

9    because it was not contractually entitled to immediately repossess the Rigs.  According to

10   Hosting Source, its termination of the Agreement triggered Block Mining's "obligat[ion]

11   to remove no more than 400 pieces of Equipment per month" under Section 11.1 of the

12   Agreement.  (Agreement, Ex. A § 11.1; *see also* Def. MTD at 7.)  Pursuant to Section

13   11.1, Hosting Source proposed "a removal schedule extending through July 2024" after it

14   terminated the Agreement, allegedly promising that "it would increase the power output

15   to the Rigs" until "the terms for each miner expired" and they were removed from the

16   Facility.  (Compl. ¶¶ 66-67.)  Although it disputed Hosting Source's interpretation of

17   Section 11.1, Block Mining "decided to accept" this arrangement.  (*Id.* ¶ 67.)  Hosting

18   Source now argues that, because Block Mining "consented to the termination agreement"

19   and the removal dates have not yet passed, Block Mining's conversion claim "lacks

20   merit" and "is not ripe."  (Def. MTD at 7.)  Block Mining counters that Section 11.1

21   merely "sets a cap for how many Rigs Hostin[g] Source can *force* Block Mining to

22   remove," and "[n]othing [p]recludes Block Mining from removing as many Rigs as it

1    wants" pursuant to Sections 11.2 and 11.3 of the Agreement (Pl. Resp. at 6-7), which

2    contemplate Block Mining's "immediate possession" and "access" to the Rigs upon

3    termination of the Agreement for any reason (Agreement, Ex. A §§ 11.2, 11.3).  Block

4    Mining further argues that, even if the parties modified the Agreement by assenting to a

5    subsequent "termination agreement," Block Mining is not bound by the removal schedule

6    because Hosting Source breached that subsequent agreement by failing to restore the Rigs

7    to full power pending their removal.  (Pl. Resp. at 7-9.)

8           The parties offer competing interpretations of the Agreement—specifically,

9    Sections 11.1 through 11.3, and their effect on Block Mining's possessory rights in its

10   Rigs.  The court must therefore apply Washington contract law to evaluate the sufficiency

11   of Block Mining's conversion claim.  "The purpose of contract interpretation is to

12   ascertain the intent of the parties." *Kelley v. Tonda*, 393 P.3d 824, 829 (Wash. Ct. App.

13   2017).  Washington follows "the 'objective manifestation theory' of contracts, wherein

14   the parties' intent is determined by focusing on the objective manifestations of the

15   agreement, rather than on the unexpressed subjective intent of the parties." *Radliff v.*

16   *Schmidt*, 532 P.3d 622, 625 (Wash. Ct. App. 2023).  "Clear and unambiguous contracts

17   are enforced as written." *Grey v. Leach*, 244 P.3d 970, 975 (Wash. Ct. App. 2010).

18   "Language in a contract is ambiguous if it is susceptible to two different but reasonable

19   interpretations or where separate contractual provisions irreconcilably conflict." *Radliff*,

20   532 P.3d at 625; *see also id.* ("When contract provisions conflict," the court must

21   "harmonize them to the extent possible.").  "[A]mbiguity will not be read into a contract

22   where it can reasonably be avoided by reading the contract as a whole." *McGary v.*

*Westlake Invs.*, 661 P.2d 971, 974 (Wash. 1983). "Interpretations giving lawful effect to

all the provisions in a contract are favored over those that render some of the language

meaningless or ineffective." *Grey*, 244 P.3d at 976. Contractual "ambiguity presents a

question of fact that can[] [neither] be determined as a legal matter" nor "resolved at the

motion to dismiss stage." *Smokey Point Com., LLC v. Dick's Sporting Goods, Inc.*, No.

C17-1015JLR, 2017 WL 4882664, at *4 (W.D. Wash. Oct. 30, 2017) (citing *GMAC v.

Everett Chevrolet, Inc.*, 317 P.3d 1074, 1078 (Wash. Ct. App. 2014)). Thus, to prevail,

Hosting Source must show that its interpretation of the Agreement is the only reasonable

interpretation of the Agreement. *See id.*

Hosting Source does not even attempt to make this showing and would rather

ignore Sections 11.2 and 11.3 altogether. (*See generally* Def. MTD (failing to discuss,

cite, or otherwise acknowledge these provisions at all); Def. Reply (same).) The court

concludes not only that Hosting Source fails to make the requisite showing, but that

Block Mining offers the only reasonable interpretation of the Agreement. Hosting

Source's reading of Section 11.1 has initial appeal but falls apart when the contract is

read as a whole. If the court were to read Section 11.1 in isolation as Hosting Source

does, the Agreement would entitle Block Mining to immediate possession of only some

of its Rigs upon Hosting Source's termination of the Agreement. But Sections 11.2 and

11.3 expressly contemplate Block Mining's right to "immediate possession of *all*" of its

Rigs upon termination of the Agreement "for *any* reason." (Agreement, Ex. A §§ 11.2-.3

(emphasis added).) Hosting Source's interpretation of the Agreement would therefore

render Sections 11.2 and 11.3 meaningless. Conversely, if Section 11.1 is properly read

1    as limiting the number of Rigs Hosting Source can force Block Mining to remove upon

2    Hosting Source's election to terminate the Agreement, Block Mining could still exercise

3    its rights under Sections 11.2 and 11.3 to immediately repossess as many Rigs as it wants.

4    This understanding gives force to the immediate possessory rights that Sections 11.2 and

5    11.3 plainly confer to Block Mining.  *Grey*, 244 P.3d at 976.  For these reasons, Hosting

6    Source's interpretation of the Agreement is unreasonable and fails as a matter of law.

7    The Agreement unambiguously entitles Block Mining to immediate possession of all of

8    its Rigs under the circumstances alleged in the complaint.

9          To the extent Hosting Source argues Block Mining is bound by a subsequent

10   removal agreement (*see* Def. MTD at 7), Block Mining plausibly alleges that any such

11   agreement required Hosting Source to restore the remaining Rigs to full power (Compl.

12   ¶¶ 65-68).  (*See* Pl. Resp. at 7-8.)  Because Hosting Source allegedly failed to do so (*id.*

13   ¶ 68), Block Mining plausibly alleges that it was discharged from its duties under any

14   subsequent removal agreement based on Hosting Source's material breach of that

15   agreement.  *See Skyline Contractors, Inc. v. Spokane Hous. Auth.*, 289 P.3d 690, 695

16   (Wash. Ct. App. 2012) ("One party's material breach . . . will discharge the duty of the

17   other party."); *see also Moore v. Blue Frog Mobile, Inc.*, 221 P.3d 913, 917 n.2 (Wash.

18   Ct. App. 2009) ("A material breach is one serious enough to justify the other party's

19   abandoning the contract because the contract's purpose is defeated.").

20         In sum, the court concludes that Block Mining states a plausible conversion claim

21   under Washington law.  The court therefore DENIES Hosting Source's motion to dismiss

22   this claim.

ORDER - 16

1    2.  <u>Trespass to Chattels</u>

2    "Trespass to chattels is something less than a conversion."  *Sexton v. Brown*, No.

3    61363-4-I, 2008 WL 4616705, at *5 (Wash. Ct. App. 2008) (unpublished).  "It is the

4    intentional interference with a party's personal property without justification that

5    deprives the owner of possession or use."  *Id.* (citing Restatement (Second) of Torts

6    § 217 (Am. L. Inst. 1965)).  "While a plaintiff must show that the interference was

7    intentional, no intent to deprive the owner must be shown."  *Id.*  "In order to sustain an

8    action for trespass to chattel, however, there must be 'some actual damage to the

9    chattel.'"  *G&G Closed Circuit Events, LLC v. Single, LLC*, No. C18-1295JLR, 2020 WL

10   5815050, at *4 (W.D. Wash. Sept. 30, 2020) (quoting W. Keeton, D. Dobbs, R. Keeton,

11   & D. Owen, Prosser & Keeton on Law of Torts 87 (5th ed. 1984)); *see also* Restatement

12   (Second) of Torts § 218, cmt. e (1965) ("[O]ne who intentionally intermeddles with

13   another's chattel is subject to liability only if his intermeddling is harmful to the

14   possessor's materially valuable interest in the physical condition, quality, or value of the

15   chattel . . . .").  "Generally, there are three types of cognizable harms for a trespass to

16   chattels claim: '(1) actual dispossession, which implies that the plaintiff's access to the

17   chattel is barred or substantially limited for something more than a few moments;

18   (2) physical harm to the chattel; or (3) physical harm to the plaintiff or to someone or

19   something in which the plaintiff had a legal interest.'"  *G&G Closed Circuit Events*, 2020

20   WL 5815050, at *4 (quoting D. Dobbs, P. Hayden, & E. Bublick, The Law of Torts § 60

21   (2d ed. 2015)).

22   *//*

As discussed above, the Agreement contractually entitled Block Mining to immediate possession of its Rigs upon termination of the Agreement for any reason.  In light of this conclusion, Block Mining plausibly alleges that Hosting Source committed trespass to chattels by terminating the Agreement and thereafter intentionally barring Block Mining from physically accessing its Rigs for an extended period of time, despite Block Mining's desire to retake physical possession of the Rigs.  (*See* Compl. ¶¶ 62-63, 73-77, 92-97.)  None of Hosting Source's arguments persuade the court otherwise, particularly because they appear to be rooted in large part in an objectively unreasonable reading of the Agreement, which the court has now rejected as a matter of law.  (*See* Def. MTD at 8-10; Def. Reply at 4-7.)  To the extent Hosting Source argues Block Mining cannot plead harm based on Hosting Source's physical possession of the computers (Def. MTD at 10), that argument falls flat under *G&G Closed Circuit Events*.  2020 WL 5815050, at *4 (recognizing that cognizable harm in the context of trespass to chattels can include "actual dispossession," meaning "the plaintiff's access to the chattel is barred or substantially limited for something more than a few moments").  Moreover, Hosting Source appears to deliberately ignore the nature of the claimed damages, stating "Block Mining would need to argue that their damages were a direct result of denied access." (Def. MTD at 10 (suggesting this "stance . . . is indefensible in this scenario given that the alleged financial losses incurred are logically tied to the volatile nature of the cryptocurrency market").)  But Block Mining *does* make this allegation (among others): it claims that Hosting Source blocked its access to the Rigs and unilaterally shut them down without authorization, causing Block Mining to suffer damages unrelated to market

1  volatility because it is unable to use its own to property to mine new BTC at maximum

2  power and efficiency.  (*See* Compl. ¶¶ 1, 4-5, 69-70, 73-77, 92-97.)

3      The court concludes that Block Mining states a plausible trespass to chattels claim

4  under Washington law.  Therefore, Hosting Source's motion to dismiss Block Mining's

5  trespass to chattels claim is DENIED.

6      3.  Permanent Injunction

7      Finally, Hosting Source moves to dismiss Block Mining's claim for a permanent

8  injunction.  (Def. MTD at 11.)  As many courts recognize, "an injunction is not a cause of

9  action, but rather a remedy."  *Krusee v. Bank of Am., N.A.*, No. C13-0824RSM, 2013 WL

10  3973966, at *5 (W.D. Wash. July 30, 2013); *see also Marzan v. Bank of Am.*, 779 F.

11  Supp. 2d 1140, 1146 (D. Haw. 2011) (collecting cases).  Thus, to the extent Block

12  Mining attempts to assert an independent cause of action for a permanent injunction, this

13  claim is DISMISSED with prejudice.

14  **C.  Block Mining's Motion to Dismiss**

15      Block Mining moves to dismiss Hosting Source's breach of contract counterclaim

16  based on the absence of subject matter jurisdiction and failure to state a claim.  The court

17  concludes that it has supplemental jurisdiction over Hosting Source's counterclaim, but

18  that Hosting Source fails to state a breach of contract claim under Washington law.

19      1.  Subject Matter Jurisdiction

20      "It is a fundamental precept that federal courts are courts of limited jurisdiction."

21  *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978); *see also* Fed. R. Civ.

22  P. 12(b)(1) (authorizing dismissal for lack of subject matter jurisdiction).  Federal courts

1    have original jurisdiction over all civil actions "arising under the Constitution, laws, or

2    treaties of the United States" and in all civil actions where complete diversity of

3    citizenship exists and the amount in controversy exceeds $75,000.  28 U.S.C. §§ 1331,

4    1332.  In addition, a district court that has original jurisdiction over a civil action "shall

5    have supplemental jurisdiction," subject to certain exceptions, "over all other claims that

6    are so related to claims in the action within such original jurisdiction that they form part

7    of the same case or controversy under Article III of the United States Constitution."  28

8    U.S.C. § 1367(a).  Claims form part of the same case or controversy when they share a

9    common nucleus of operative fact and would ordinarily be tried together.  *See*

10   *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004).  "In exercising its discretion

11   to decline supplemental jurisdiction, a district court must undertake a case-specific

12   analysis to determine whether declining supplemental jurisdiction 'comports with the

13   underlying objective of most sensibly accommodat[ing] the values of economy,

14   convenience, fairness and comity.'"  *Id.* (quoting *Exec. Software N. Am., Inc. v. U.S. Dist.*

15   *Ct.*, 24 F.3d 1545, 1557-58 (9th Cir. 1994)); *see also* 28 U.S.C. § 1367(c) (setting forth

16   circumstances in which court may appropriately decline to exercise supplemental

17   jurisdiction).

18        Here, the court has original jurisdiction over Block Mining's claims on the basis of

19   diversity, but diversity jurisdiction is lacking with respect to Hosting Source's state law

20   breach of contract counterclaim because Hosting Source fails to plead the amount in

21   controversy.  (*See generally* Answer); *see also, e.g.*, *Sparrow v. Mazda Am. Credit*, 385

22   F. Supp. 2d 1063, 1065-66 (E.D. Cal. 2005) ("Diversity jurisdiction cannot provide an

1    independent jurisdictional basis for Defendant's counterclaims because the amount

2    Defendant is claiming is not over $75,000, as 28 U.S.C. § 1332 requires.").[7]  Thus, 28

3    U.S.C. § 1367 provides the only possible basis for subject matter jurisdiction over

4    Hosting Source's counterclaim.[8]  (*See* Def. Resp. at 8-9 (asserting supplemental

5    jurisdiction).)  The court has little trouble concluding that Hosting Source's breach of

6    contract counterclaim shares a common nucleus of operative facts with Block Mining's

7    claims, such that they form the same case or controversy sufficient to establish

8    supplemental jurisdiction.  All claims arise out of the same contractual relationship and

9    the same series of events that caused the relationship to fall apart.  Further, none of the

10   exceptions to supplemental jurisdiction under 28 U.S.C. § 1367(c) apply to this case, and

11   declining supplemental jurisdiction would not promote economy, convenience, fairness,

12   or comity under the circumstances.  Accordingly, the court will exercise supplemental

13   jurisdiction over Hosting Source's breach of contract counterclaim pursuant to 28 U.S.C.

14   § 1367.

15   //

16

---

17   [7] "The essential elements of diversity jurisdiction . . . must be affirmatively alleged in the
     pleadings."  *Rainero v. Archon Corp.*, 844 F.3d 832, 840 (9th Cir. 2016) (cleaned up).  The court

18   therefore declines Hosting Source's invitation to look outside the pleadings for information
     respecting the amount in controversy.  (*See* Def. Resp. at 8.)

19   [8]  The parties dispute whether Hosting Source's counterclaim is compulsory or
     permissive.  (*See* Def. Resp. at 6-8; Pl. Reply at 2.)  This issue is a red herring because 28 U.S.C.

20   § 1367 governs the question of subject matter jurisdiction over Hosting Source's counterclaim:
     "Prior to the passage of § 1367, courts relied on the distinction between compulsory and

21   permissive counterclaims to determine whether jurisdiction over a counterclaim was proper
     absent an independent basis for subject matter jurisdiction," but "§ 1367 now governs the limits

22   on supplemental jurisdiction."  *Ader v. SimonMed Imaging Inc.*, 324 F. Supp. 3d 1045, 1051 (D.
     Ariz. 2018).

1     2. <u>Facial Plausibility</u>

2     A party asserting a breach of contract claim must allege the existence of a valid

3 contract between the parties, breach, and resulting damage. *See Lehrer v. Wash. Dep't of*

4 *Soc. & Health Servs.*, 5 P.3d 722, 727 (Wash. Ct. App. 2000); *see also Nw. Indep. Forest*

5 *Mfrs. v. Dep't of Lab. & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995) ("A breach of

6 contract is actionable only if the contract imposes a duty, the duty is breached, and the

7 breach proximately causes damage to the claimant."). The parties here do not dispute the

8 existence of a contract and associated contractual duties. (*See* Pl. MTD at 8; Def. Resp.

9 at 5.) Rather, Block Mining argues Hosting Source "falls woefully short" of minimum

10 pleading standards because it fails to identify the specific contract provisions Block

11 Mining allegedly breached, offering only "vague and conclusory allegations" that Block

12 Mining generally owes Hosting Source "unspecified 'expenses'" under the Agreement.

13 (Pl. MTD at 8-9.) Block Mining further argues that Hosting Source fails to sufficiently

14 plead damages because "Hosting Source seems to allege that its damages are amounts it

15 incurred to defend Block Mining's lawsuit, rather than any damages resulting from" the

16 alleged breach of contract. (Pl. Reply at 6-7.) The court agrees with Block Mining.

17     The allegations relevant to Hosting Source's counterclaim are as follows:

18     • "Block Mining and Hosting Source entered into a profit-sharing colocation
19       agreement that was fully executed on or about December 29, 2021, with an
      effective date of July 1, 2021 (the 'Contract')." (Answer ¶ 1.1.)

20     • "Under the terms of the Contract, the 'Customer is solely responsible for
21       the Costs associated with Generated Digital Assets for each month.'" (*Id.*
      ¶ 1.3.)

22 //

- "Under the terms of the Contract, Block Mining and Hosting Source agreed to a profit-sharing split concerning mining of the digital assets, Bitcoin." (*Id.* ¶ 1.4.)

- "Under the terms of the contract, Block Mining acknowledged the inherent risks in mining Bitcoin, but still agreed to be 'solely responsible for the Costs associated with Generated Digital Assets for each month.'" (*Id.* ¶ 1.7.)

- "Block Mining incurred expenses in the colocation agreement, which were anticipated to be offset by Bitcoin mining profits.  However, any negative shortfall of Bitcoin would be added to the Costs.  There were months where the electricity costs incurred were not fully offset by Bitcoin, and thus there were monies due and owing to Hosting Source for providing energy to the computers." (*Id.* ¶ 1.8.)

- "Block Mining paid for monthly costs with a wire to Hosting Source in USD.  Block Mining significantly reduced the amount of the monthly USD wire and were no longer attempting to pay the monthly costs." (*Id.* ¶ 1.9.)

- "Block Mining failed to timely pay all monies due and owing to Hosting Source." (*Id.* ¶ 1.10.)

- "Block Mining seeks to frustrate the terms of the contract to the financial detriment of Hosting Source." (*Id.* ¶ 1.14.)

- "Hosting Source's damages are proximately and directly caused by Block Mining's actions or failure to act." (*Id.* ¶ 1.15.)

- "Hosting Source continues to incur damages because of Block Mining's conduct." (*Id.* ¶ 1.16.)

- "Hosting Source is entitled to recover against Block Mining for all damages caused by the wrongful filing of this breach of contract claim, plus reasonable attorney fees and costs in defending this lawsuit." (*Id.* ¶ 1.17.)

These allegations fall well short of pleading a breach of contract claim.

First, Hosting Source does not identify the specific provision of the Agreement that Block Mining allegedly breached.  Block Mining is correct that "[t]he Agreement contains multiple terms relating to payments."  (Pl. Reply at 5; *see* Agreement, Ex. A

ORDER - 23

§§ 2.2, 5-6, 17.12)  Yet, Hosting Source's generalized allegations regarding outstanding

payment obligations are untethered to any specific duty outlined in the Agreement.

Although Hosting Source makes passing reference to several provisions of the

Agreement, it fails to explain which provisions were breached, and how.  Without more,

the court cannot evaluate the sufficiency of the counterclaim.  Hosting Source baldly

asserts, without citation to authority, that "[t]here is no requirement to specifically plead

exact contract provisions in general failure to pay allegations stemming from a services

contract."  (Def. Resp. at 12-13.)  But in fact, federal courts regularly dismiss unadorned

breach of contract claims where the claimant fails to cite the contractual provision that

was allegedly breached.  *See Corner Computing Sols. v. Google LLC*, No. C23-0939TL,

2024 WL 841462, at *3 (W.D. Wash. Feb. 28, 2024); *Lemelson v. Wells Fargo Bank,*

*N.A.*, 641 F. Supp. 3d 1005, 1011-12 (W.D. Wash. 2022) (Robart, J.); *Engage BDR v.*

*GoDaddy*, No. 2:21-cv-02014-JVC (ASx), 2021 WL 8820555, at *2-3 (C.D. Cal. Sept.

23, 2021); *McClellon v. Citigrp. Glob. Mkts., Inc.*, No. C18-0978JCC, 2018 WL

5808440, at *5 (W.D. Wash. Nov. 6, 2018); *Ill. Nat'l Ins. Co. v. Nordic PCL Constr.,*

*Inc.*, 870 F. Supp. 2d 1015, 1034-36 (D. Haw. 2012); *Young v. Facebook, Inc.*, 790 F.

Supp. 2d 1110, 1117 (N.D. Cal. 2011); *Miron v. Herbalife Int'l, Inc.*, 11 F. App'x 927,

929 (9th Cir. 2001) (unpublished).  Here, Hosting Source's failure to specifically identify

the relevant contract provisions or sufficiently describe the allegedly breaching conduct

//

//

//

1    leaves Block Mining without fair notice of the factual basis of the counterclaim,

2    warranting dismissal.[9]

3          Second, Hosting Source fails to adequately plead that Block Mining's alleged

4    breach proximately caused its damages.  Although Hosting Source alleges its damages

5    "are proximately and directly caused by Block Mining's actions or failure to act"

6    (Answer ¶ 1.15), the allegations suggest Hosting Source's claimed damages stem from

7    Block Mining's initiation of this lawsuit—not from any alleged breach of contract.  (*See*

8    *id.* ¶ 1.17 ("Hosting Source is entitled to recover against Block Mining for all damages

9    caused by the wrongful filing of this breach of contract claim.").)  Hosting Source's

10   argument that "[g]eneral damages do not need to be pled with specificity" misses the

11   point.  (Def. Resp. at 13 (citing *Prudence Co. v. Fid. & Deposit Co. of Md.*, 297 U.S. 198,

12

13   _____

14       [9] Block Mining raises an additional, related argument that its payment obligations under
     Section 5 of the Agreement were conditioned upon Hosting Source first providing "the estimated

15   Costs for each month by the 5th day of each month."  (Agreement, Ex. A § 5; *see also* Pl. MTD
     at 9-10; Pl. Reply at 6.)  According to Block Mining, Hosting Source fails to state a breach of

16   contract claim for the independent reason that it offers no factual allegations showing that it
     provided those cost estimates so as to trigger Block Mining's obligation to pay the estimated
     costs.  The court disagrees.  In Washington, "failure o[f] a condition precedent will discharge the

17   duty of the other party."  *Skyline Contractors*, 289 P.3d at 695.  "A condition precedent is
     contrasted with a promise, which 'subjects the promisor to liability for damages, but does not
     necessarily discharge the other party's duty of performance.'"  *BOFI Fed. Bank v. Advance*

18   *Funding LLC*, 105 F. Supp. 3d 1215, 1219-20 (W.D. Wash. 2015) (quoting *Jones Assocs., Inc. v.
     Eastside Props., Inc.*, 704 P.2d 681, 684 (Wash. Ct. App. 1985)).  Whether a contractual

19   provision is a condition precedent or a mere promise depends on the intent of the parties.  *Jones
     Assocs.*, 704 P.2d at 684.  "An intent to create a condition is often revealed by such phrases and
     words as 'provided that,' 'on condition,' 'when,' 'so that,' 'while,' 'as soon as,' and 'after.'"  *Id.*

20   (quoting *Vogt v. Hovander*, 616 P.2d 660, 666 (Wash. Ct. App. 1979)); *see also id.* ("Where it is
     doubtful whether the words create a promise or an express condition, they are interpreted as

21   creating a promise.").  Here, Section 5 contains no language indicating an intent to condition
     Block Mining's duty to pay upon Hosting Source first providing the cost estimates.  (*See*

22   Agreement, Ex. A § 5.)  Section 5 is properly read as creating mere promises.

207-08 (1936)).  The problem is not that Hosting Source fails to specify an exact amount of claimed damages, but that it fails to allege Block Mining's supposed breach proximately caused its damages, which is an essential element of a breach of contract claim.  *Nw. Indep. Forest Mfrs.*, 899 P.2d at 9.

Because Hosting Source fails to state a claim for breach of contract, the court GRANTS Block Mining's motion to dismiss this counterclaim pursuant to Rule 12(b)(6).

**D.    Leave to Amend**

A district court that dismisses a claim under Rule 12(b)(6) should generally grant leave to amend, "unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).  Block Mining's "claim" for a permanent injunction fails as a matter of law, and is therefore dismissed with prejudice, as explained above.  But because Hosting Source could cure its breach of contract counterclaim by alleging other facts, the court GRANTS Hosting Source leave to amend.

//

//

//

//

//

//

//

//

**IV.   CONCLUSION**

For the foregoing reasons, the court GRANTS in part and DENIES in part Hosting Source's motion to dismiss (Dkt. # 25), and GRANTS Block Mining's motion to dismiss (Dkt. # 37), as set forth above.  Hosting Source shall file its amended counterclaim by no later than June 28, 2024.

Dated this 14th day of June, 2024.

JAMES L. ROBART
United States District Judge