# EXHIBIT G

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

BLOCK MINING, INC., f/k/a/
BLOCKWARE MINING, INC.

               Plaintiff,

vs.

HOSTING SOURCE, LLC,

               Defendant.

CASE NO. 2:24-cv-00319-JLR

**EXPERT REPORT**

---

**James P. Brennan**
**Senior Managing Director**
**J.S. Held LLC**
**September 22, 2025**

---

## Table of Contents

I. INTRODUCTION ................................................................................................................ 1

    Retention ........................................................................................................................... 1

    Qualifications .................................................................................................................... 3

II. SUMMARY OPINIONS ................................................................................................... 5

III. BACKGROUND ............................................................................................................... 7

IV. DETAILED FINDINGS .................................................................................................. 12

    Opinion #1 - Hosting Source's Unauthorized Retention of Block Mining Machines and
    Theft of Block Mining's BTC Mining Rewards ........................................................... 12

    Opinion #2 - How Much BTC Should Have Been Mined ............................................ 13

    Opinion #3 – Depreciation Of Rigs / Lost Rewards and Revenue ................................ 18

        Calculation .............................................................................................................. 20

        Impact of the Halving on Replacement costs ........................................................ 21

VI. CONCLUSION ............................................................................................................... 23

EXHIBIT A: DOCUMENTS RELIED UPON .......................................................................... 1

EXHIBIT B: JAMES P. BRENNAN CURRICULUM VITAE ................................................ 1

EXHIBIT C: Mining Calculations ............................................................................................. 2

## I. INTRODUCTION

**Retention**

1.      I have been engaged by McDermott Will & Schulte ("Counsel") on behalf of Block Mining, Inc. ("Block Mining" and "Plaintiffs") in the matter of Block Mining, Inc. v. Hosting Source, LLC.

2.      Block Mining owned and operated cryptocurrency mining facilities around the country. (Marchiori Dec. ¶ 6.)  By contract dated December 29, 2021, Block Mining contracted for Hosting Source, LLC ("Hosting Source"), to provide a facility to install Block Mining's Rigs and to provide power and connectivity to mine BTC as well as 24/7 oversight and security over the Rigs. In or around July 2024, Block Mining merged with Riot Platforms, Inc., a publicly traded cryptocurrency mining firm.

3.      The background included herein is not intended to encompass a detailed recitation of all underlying facts or issues but rather provide context for my opinions.

4.      This report sets forth information regarding my qualifications, the subject matter of any potential testimony, and the reasons for and substance of my opinions. I have been assisted by associates of J.S. Held, LLC ("J.S. Held") in the conduct of research and analysis. I prepared this report and the opinions reflected herein are mine. The work performed on this matter was done in accordance with Statement on Standards for Forensic Services ("SSFS") No. 1 issued by the American Institute of Certified Public Accountants ("AICPA").

5.      J.S. Held is being compensated at a rate of $850 per hour for the time I have spent performing the work necessary to prepare this Expert Report. In addition, I have been assisted by others working under my direction and supervision at hourly rates ranging from $150 to $850. J.S. Held's compensation is not contingent upon the opinions I express or upon the outcome of this matter.

6.      I have relied upon those documents listed in **Exhibit A**. To the extent additional documents are produced or testimony given in this matter, I reserve the right to amend or modify my conclusions. To the extent I am asked to consider other expert reports in this matter, those may impact my analyses and opinions that could require updates to my report.

7.      Further, should this matter proceed to trial, I anticipate preparing demonstratives to support my work for presentation at trial.

8.      Except as otherwise indicated herein, all facts set forth in this Report are based on: (i) my personal knowledge and/or on information provided to me by counsel; or (ii) my review of relevant documents; and (iii) my experience and training as a professional.

9.      As part of any engagement, J.S. Held follows a systematic process to inventory and collect the necessary data.  To the extent that additional data becomes available, I reserve my right to update my analysis accordingly.

**Qualifications**

10.    I am a forensic accountant with over 20 years of experience conducting analyses and providing expert testimony in matters involving accounting fraud, Ponzi-schemes, financial crimes, and asset-tracing and recovery.  I have experience in forensic accounting and investigations in fiat and cryptocurrency.

11.    I am a Senior Managing Director and Global Head of Fintech, Payments, and Crypto Compliance and Investigations at J.S. Held.  J.S. Held is a global professional service firm which provides technical, scientific, and financial advisory services.

12.    Prior to working at J.S. Held, I held positions at other investigation firms, including FTI Consulting, Alvarez & Marsal, and Kroll.  In these positions, I managed teams responsible for investigations involving money laundering, terrorist financing, Ponzi-schemes, asset theft, calculation of damages, and other fraudulent activities, as well as asset-tracing and recovery.

13.    I hold both a B.S. and a M.S. in accounting from St. John's University.  I am a Certified Fraud Examiner and a Certified Bitcoin Professional.

14.    A copy of my resume is attached as **Exhibit B**.

15.    I specialize in accounting, forensic investigations, and disputes involving complex economic and financial transactions.  A significant amount of my practice and experience involves advising on crypto-related matters.

16.    I am routinely retained to perform analyses of information related to financial crimes, which includes forensic investigations and flow-of-funds analyses related to crypto wallet addresses and fiat bank accounts.

17.    I am familiar with the forensic tools and methodologies used for conducting investigations related to both fiat and cryptocurrency in criminal, civil, bankruptcy, and regulatory matters.

3

18.     I also train domestic and international government entities concerning cryptocurrency and financial crimes.  These entities include, among others, the U.S. Department of Justice, U.S. Department of Homeland Security, and U.S. bankruptcy courts.

## II. SUMMARY OPINIONS

19.    My opinions in this matter are as follows:[1]

i.    From approximately March 2, 2024 to July 1, 2024, when Hosting Source refused to return Block Mining's rigs, Hosting Source directed the BTC mining rewards generated by Block Mining's rigs to Hosting Source's own addresses rather than to Block Mining's designated addresses, essentially funneling the proceeds of Block Mining's machines to itself. During this time, Hosting Source should have mined approximately 10.57 BTC,[2] which are currently worth $1,219,746.[3]

ii.    From at least January 2023 through July 2024, Hosting Source operated Block Mining's rigs at power levels significantly below those specified in the parties' agreement, resulting in Block Mining mining substantially less BTC than it would have if Hosting Source had provided its rigs with the agreed-upon mining power. Indeed, Hosting Source operated Block Mining's rigs in "low power mode" or "low, low power mode" for extended periods, well below the hashrate specified in the agreement (141.704 PH/s). From January 2023 through July 2024, had Hosting Source operated the rigs in normal power mode, rather than low power mode, Hosting Source should have mined 21.48 additional BTC than it actually did.[4]

iii.    Hosting Source's failure to return Block Mining's rigs in a timely manner deprived Block Mining of the use and value of its assets. This is because mining rigs lose value quickly due to rapid technological advancements and

---

[1] *See* **Exhibit C – Mining Calculations** for related analysis.

[2] Calculated based on mining rig remove schedule from Frank Marchiori Declaration Exhibit I. Available mining TH/s rate is calculated on a weighted average of machine mix from the "Expense Invoices" tab of the provided documentation and remaining mining equipment running at full power.

[3] USD value based on CoinGecko end of day BTC price of $115,397 on September 15, 2024.  I understand that Hosting Source claims it mined approximately 5.3 BTC, all of which it sold for USD at prices far below current prices, despite claiming that it was holding the BTC "in trust."  Deposition of Joe (Kamia) Teegarden "Joe (Kamia). Assuming it is true that Hosting Source mined only 5.3 BTC during the time it was funneling Block Mining's bitcoin to itself, there is at least a shortfall of about 5.27 in BTC, presently worth about $608,142. Teegarden - 07-07-2025.pdf" pg. 227.

[4] Had block mining not removed the 402 machines in February 7, 2024 and remained at the contracted hashrate there would be an additional 1.43 BTC. Additionally, had the machines been running 150 PH/s as demonstrated in prior time periods the overall BTC shortfall would increase by 10.38 BTC.

frequent hardware upgrades in the cryptocurrency mining industry. As a result, Block Mining suffered losses due to the replacement cost of the mining rigs and the inability to redeploy or liquidate those assets as planned. I have estimated Block Mining's losses to be between $2,732,000 to $3,174,200.

iv.  By not running Block Mining's rigs at full power, Hosting Source was able to redirect available power to additional machines for other, unrelated customers. This conduct likely resulted in increased profitability for Hosting Source at Block Mining's expense.

## III. BACKGROUND

20.    Cryptocurrency mining is the process of validating and adding new transactions to a cryptocurrency blockchain by solving complex mathematical problems, which also results in the creation of new cryptocurrency.

21.    Bitcoin is a specific type of cryptocurrency and has long been the most popular and successful cryptocurrency.

22.    When Bitcoin mining first began, miners frequently used the CPUs of ordinary computers to perform the work. Because computational power and computational efficiency are critical to successful cryptocurrency mining, however, miners switched to increasingly customized solutions as the industry evolved. Over time, traditional CPUs gave way to faster and more powerful graphics-processing-unit-based (GPU) machines.

23.    Today, even GPU-based miners are generally too slow and too inefficient to be used for large-scale mining operations.  For the past several years, serious Bitcoin miners have primarily used what are called Application-Specific Integrated Circuits, or "ASIC" miners to mine for cryptocurrency.  An ASIC miner is designed such that both the software and the hardware are optimized for mining a specific type of cryptocurrency. Accordingly, an ASIC designed to mine Bitcoin efficiently cannot mine Ethereum or any other cryptocurrency at all. It can only mine Bitcoin.

24.    Similarly, although ASIC miners are extraordinarily powerful machines, they cannot be repurposed to any other non-cryptocurrency-mining use like artificial intelligence or traditional data mining.

25.     My review of the list of mining equipment Block Mining owned co-located in Hosting Source's facility indicates the following:[5]

| Hosted Miners | Qty | TH | Total TH |
|---|---|---|---|
| S19j Pro | 669 | 104 | 69,576 |
| S19j Pro | 453 | 100 | 45,300 |
| S19j Pro | 284 | 96 | 27,264 |
| S19j Pro | 97 | 92 | 8,924 |
| S19j Pro | 5 | 88 | 440 |
| Total | 1,508 | | 151,504 |

26.     ASIC miners and other mining equipment use their computational power to solve cryptographic puzzles.

27.     These puzzles are part of the Proof-of-Work ("PoW") algorithm, which ensures that transactions are verified and added to the blockchain securely.

28.     The primary goal of PoW is to prevent double-spending and ensure that the blockchain remains tamper-proof. PoW makes it computationally expensive to alter any part of the blockchain, thereby securing the network.[6]

29.     When a miner successfully solves a puzzle, they get to add a new block of transactions to the blockchain. As a reward for their efforts, they receive a certain number of newly-created Bitcoins. This reward is known as the block reward.[7]

---

[5] Mining rig mix as of January 1, 2023, as collected from BM00000924.XLSX "Expense_Invoices" sheet.

[6] Double spending in Bitcoin refers to when the same digital money being spent twice.
[7] https://d-central.tech/how-mining-pool-rewards-work/

30.     The amount of Bitcoin in the world is deliberately finite.  Approximately every four years, the block reward is halved in an event called "halving."

31.     The most recent halving occurred on April 19, 2024 when block 840,000 was mined.

32.     As a result of that halving, now 3.125 new Bitcoins (down from 6.25) are created roughly every 10 minutes.[8]  Thus, approximately 450 Bitcoins are currently created every day.  Although the total supply of Bitcoin is not expected to be mined out until around 2140, by 2032 there will only be around 112 Bitcoins mined daily.

33.     In addition to the block reward, miners also earn transaction fees. End users submitting transactions to be processed can pay higher fees, users can effectively "jump the queue" and have their transactions included in the blockchain more quickly.  The total reward a miner receives is the sum of the block reward and the transaction fees from the transactions included in the block.[9]

34.     Earning block rewards adds to the network security of the Bitcoin blockchain where mining rewards incentivize miners to continue participating in the network, which helps maintain its security and stability. By competing to solve puzzles, miners ensure that the blockchain remains tamper-proof and that all transactions are legitimate.

35.     Because it is extraordinarily unlikely that any single piece of mining equipment will successfully mine a block, persons and businesses involved in Bitcoin mining often participate in "mining pools," which aggregate the mining resources of many market participants to combine their computational power.  When a piece of mining equipment within a mining pool successfully

---

[8] https://stormgain.com/blog/bitcoin-halving-dates-history#:~:text=around%20this%20phenomenon.-
,When%20was%20the%20last%20Bitcoin%20halving%3F,created%20roughly%20every%2010%20minutes.
[9] https://crypto.com/en/university/bitcoin-mining.

mines a block, the block reward is shared by the members of the mining pool proportionately to the computing power represented by each member.

36.    The value of any Bitcoin miner's block rewards is determined by market forces.

37.    The net economics of Bitcoin mining operations also depend heavily on each miner's costs.  These include:

     a.   Electricity costs due to the significant computational power of each piece of mining equipment. This computational power (known in the industry as "hashrate") translates to high electricity consumption. This is one of the largest ongoing costs for all miners, even those with favorable electricity contracts. Generally, Bitmain Antminers S19j miners (similar to the miners used by Defendants) consume just over 3000 watts per machine while running, and they claim to be operating several thousand machines around the clock.[10]

     b.   Transaction fees where mining pools may also take a portion of the transaction fees included in the blocks they mine. This can vary depending on the pool's payout method.

     c.   Hardware costs, including both initial investments and potential replacements or upgrades.

     d.   Maintenance costs of mining equipment to ensure each machine runs efficiently and to prevent downtime.

---

[10] https://www.cryptominerbros.com/blog/bitmain-antminer-s19j-pro-104th-overview/#:~:text=Antminer%20S19j%20Pro%20is%20a,with%20detailed%20images%20and%20instructions.

e.  Cooling costs can also be a factor depending on equipment location. These costs are to keep mining hardware cool is essential to maintain performance and longevity, these can be additional to electricity and infrastructure costs.

## IV. DETAILED FINDINGS

### Opinion #1 - Hosting Source's Unauthorized Retention of Block Mining Machines and Theft of Block Mining's BTC Mining Rewards

38.    From approximately March 2, 2024, to July 1, 2024, Hosting Source refused to return Block Mining's mining rigs, despite repeated formal demands from Block Mining.[11]

39.    While in possession of Block Mining's rigs, Hosting Source continued to operate them and redirected the resulting BTC mining rewards to wallet addresses under its own control, rather than to Block Mining's designated addresses.

40.    Based on the operational capacity of the rigs and prevailing network conditions, I estimate that the rigs should have mined approximately 10.57 BTC during the retention period.[12]

41.    As of the date of this report, this amount (10.57 BTC) is valued at approximately $1,219,746 USD.[13]

42.    Hosting Source has acknowledged that it mined approximately 5.3 BTC during the relevant period.

43.    It further claims that this BTC was converted into USD, though the details of the conversion and disposition of funds remain unclear.

44.    The discrepancy between the estimated BTC yield (10.57 BTC) and Hosting Source's claimed yield (5.3 BTC) results in a shortfall of approximately 5.26 BTC.

45.    This unaccounted-for amount is currently valued at around $606,988,[14] representing a significant financial loss to Block Mining.

---

[11] I understand that Hosting Source allowed Block Mining to retrieve a fraction of its rigs each month, but that it continued to funnel all bitcoin mining rewards to itself.  (*E.g.* Marchiori Dec. ¶ 63.)
[12] *See* **Exhibit C** – Mining Calculations.
[13] USD value based on CoinGecko.com end of day BTC price of $115,397 on September 15, 2024.
[14] USD value based on CoinGecko.com end of day BTC price of $115,397 on September 15, 2024.

46.    The table below summarizes the calculated BTC mining rewards based on the network difficulty, block rewards, and transaction fees on that day and assuming the remaining miners to be operating in full power mode.

|  | Miners | Average TH/s | BTC |
|---|---|---|---|
| March | 1,106 | 104,250 | 5.19 |
| April | 806 | 81,999 | 3.54 |
| May | 506 | 51,975 | 1.28 |
| June | 206 | 21,783 | 0.54 |
| July (end date 7/1/24) | 206 | 20,776 | 0.02 |
| Total | 655 | 64,856 | 10.57 |

## Opinion #2 – How Much BTC Should Have Been Mined

47.    Block Mining and Hosting Source made an agreement for a contracted hashrate of 141.704 PH/s.

48.    This hashrate was important because it determined how much BTC Block Mining could expect to mine and how much money the company could make.

49.    Despite this agreement, Hosting Source did not deliver the promised mining power.

50.    Instead, Block Mining's rigs only received an average hashrate of about 118 PH/s (reported) and 117 PH/s (implied). This means Block Mining received just 82.88% of what was agreed upon.

51.    This wasn't a small difference; it was a major issue that had serious financial consequences. Because Hosting Source didn't provide the full hashrate, Block Mining mined much less Bitcoin than it should have.

52.     From January 1, 2023 to February 29, 2024, the gap between what Block Mining should have mined and what it actually mined amounts to a shortfall of approximately 21.48 BTC.[15]

53.     Based on historical "point-in-time"[16] market prices of the 21.48 BTC, Block Mining lost mining rewards of $727,956.34, which directly affected Block Mining's ability to make money, run its business, and meet its goals.

54.     The ongoing lack of promised mining power also meant Block Mining missed opportunities to earn more when Bitcoin prices were high.

55.     Further, Hosting Source's decision to divert power to other customers made things worse for Block Mining, reducing its mining output and the Bitcoin rewards it could earn.

56.     Hosting Source's failure to deliver the agreed hashrate led to a significant and clear loss for Block Mining, both in Bitcoin and in dollars. The tables below summarize a notable shortfall in hashrate delivery, with only 82.88% of the contracted 141,704 TH/s being met on average. Reported and implied hashrates are closely aligned at approximately 117,950 TH/s, indicating consistent underperformance. This shortfall has resulted in a net loss of 21.48 BTC, translating to a financial impact of $727,956 at the "point-in-time" of measurement and $2,478,728 based on current market value.[17]

| Hashrate Audit Summary | |
|---|---:|
| Contracted Hashrate (TH/s) | 141,704 |
| Reported Avg (TH/s) | 117,956 |
| Implied Avg (TH/s) | 117,441 |
| Delivered vs Contracted | 82.88% |

---

[15] *See* **Exhibit C** – Mining Calculations.
[16] Point-in-time pricing refers to the valuation of the BTC on the day it was mined. The BTC price used was from the documents supplied by the client, which were collected from coinmarketcap.com and are an average of the high low prices reported for the day. The current value of 21.48 BTC is $2,478,727.56 based on CoinGecko.com end of day BTC price of $115,397 on September 15, 2024.
[17] Point-in-time pricing refers to the valuation of the BTC on the day it was mined. The BTC price used was from the documents supplied by the client, which were collected from coinmarketcap.com and are an average of the high low prices reported for the day. Current market value based on CoinGecko.com end of day BTC price of $115,397 on September 15, 2024.

| Net Shortall (BTC) Total | 21.48 |
| Net Shortall (Point in Time USD) Total | $727,956 |
| Net Shortall (Current USD) Total | $2,478,728 |

| 2023 | BTC | Point in Time USD | Current USD |
|---|---|---|---|
| Jan | -0.81 | $(16,169) | $(93,472) |
| Feb | 0.43 | $10,028 | $49,621 |
| Mar | 1.75 | $44,790 | $201,945 |
| Apr | 1.94 | $56,069 | $223,870 |
| May | 2.08 | $57,377 | $240,026 |
| Jun | 1.36 | $37,487 | $156,940 |
| Jul | 1.33 | $39,947 | $153,478 |
| Aug | 1.44 | $40,207 | $166,172 |
| Sep | 1.23 | $32,363 | $141,938 |
| Oct | 1.97 | $58,559 | $227,332 |
| Nov | 2.31 | $84,386 | $266,567 |
| Dec | 2.92 | $123,792 | $336,959 |
| Jan | 2.32 | $99,362 | $267,721 |
| Feb | 1.23 | $59,759 | $141,938 |
| | 21.48 | $727,956 | $2,478,728 |

57.    Furthermore, the 21.48 BTC shortfall is a conservative amount given that Block Mining removed 402 machines in early February 2024. Had those machines not been removed an additional 1.43 BTC could have been mined at the contracted rate of 141.7 PH/s.

58.    The chart below ("Hashrate: Contracted vs. Reported vs. Implied") demonstrates the reduction in hashrate from January 1, 2023 to February 29, 2024.

59.    The "Reported TH/s" (orange line) was collected from documentation provided by the Block Mining,[18] confirmed through the supplied FoudryPoolUSA API link, and based on my

---

[18] BM00000924.XLSX, BM00000925.XLSX, BM00000926.XLSX, BM00000927.XLSX, BM00000928.XLSX, BM00000929.XLSX, BM00000930.XLSX, BM00000931.XLSX, PROD-DEF- 00000834.XLSX, PROD-DEF-00000835.XLSX, PROD-DEF- 00000836.XLSX, BM00000216.XLSX, BM00000215.XLSX, and BM00000088.XLSX

understanding and belief to be the actual daily hashrate Block Mining was allocated during the relevant time period.

60.    The Implied Terahash per Second ("Implied TH/s") (green line) which represents the effective mining power that can be inferred from the actual Bitcoin payouts received, rather than the hashrate the pool reported or was contractually promised. It is calculated by comparing the actual Bitcoin earnings to the expected earnings per unit of hashrate, given the network difficulty, block rewards, and transaction fees on that day. In essence, Implied TH/s answers the question: "Based on what Block Mining was paid, how much hashrate must they have been allocated?" This measure provides an independent benchmark to evaluate whether the contracted hashrate was fully delivered.

61.    From February 8, 2023 to February 29, 2024, the reported and implied hashrates, derived from actual performance and payout data, consistently fall below the contracted threshold. Notably, there are significant drops in reported and implied hashrates around March 2023 and February 2024, the latter driven by the Block Mining's removal of 402 rigs, further widening the gap between expected and delivered performance. This continued shortfall in delivered hashrate directly correlates with reduced mining output and, consequently, underpayment relative to the contractual obligations.

62.    Furthermore, the implied hashrate, calculated from actual payout data, closely mirrors the reported hashrate throughout the observed period, with only minor deviations. This strong correlation between the two metrics reinforces the reliability of both the reported hashrate and the methodology used to derive the implied hashrate. The consistency between these figures substantiates the conclusion that the mining pool's actual performance was materially below the contracted hashrate, and that the implied hashrate is a valid and accurate representation of the hashrate used to determine payouts.



63.    Based on historical performance data, including the early 2023 period reflected in the referenced chart, the mix of miners owned by Block Mining was capable of sustaining a hash rate of approximately 150 PH/s. Had Hosting Source not reduced power to the rigs, I can conclude that this level of hash rate would have remained consistent and achievable throughout the relevant period.

64.    Assuming a sustained average hash rate of 150 PH/s from January 1, 2023, through February 29, 2024, the estimated BTC shortfall would increase from the currently calculated 21.48 BTC to approximately 31.86 BTC, representing a significant additional loss attributable to Hosting Source's actions.[19]

65.    Furthermore, the current value of 21.48 BTC is approximately $2,478,728 and the 31.86 BTC is $3,676,548.[20]

---

[19] *See* **Exhibit C** – Mining Calculations.
[20] Current market value based on CoinGecko.com end of day BTC price of $115,397 on September 15, 2024.

**Opinion #3 – Depreciation Of Rigs / Lost Rewards and Revenue**

66.    Block Mining's rigs are valuable assets that generate revenue by mining bitcoin. Based on the agreement with Hosting Source, Block Mining expected to use these at full capacity for the duration of the contract.

67.    However, Hosting Source failed to return the Block Mining rigs in a timely manner and did not operate them at the agreed hashrate.  The longer the rigs sat idle or operated below capacity, the more they depreciated in value.

68.    Block Mining lost the ability to recover the Rigs' full value through mining operations or resale as well as the ability to mine bitcoin rewards.

69.    As mentioned above, the rigs produced less BTC than they should have because Hosting Source delivered only about 83% of the contracted mining power, resulting in a shortfall of 21.48 BTC, a financial loss of over $2 million at current market values.[21]

70.    Block Mining missed out on both the expected mining rewards and the opportunity to earn more during the periods when BTC prices were higher.

71.    The company also lost value on its rigs due to delayed return and underuse, further impacting the bottom line.

72.    As set forth above, the allocation of power and the prolonged operation of Block Mining's rigs in low power mode by Hosting Source had significant technical, financial, and contractual impacts, as detailed below.

73.    The following chart compares the expected power consumption (orange line), to the implied daily power consumption ("Implied Power Consumption"). Implied power consumption represents the estimated daily electricity usage that corresponds to the actual mining

---

[21] Value based on CoinGecko.com end of day BTC price of $115,397 on September 15, 2024.

performance credited to Block Mining. Rather than relying on the pool's reported machine counts or stated power draw, this figure is derived by applying the contracted miners' nameplate efficiency (kilowatts per terahash) to the implied hashrate inferred from actual Bitcoin payouts. In practical terms, the chart shows the anticipated power Block Mining should have consumed based on the amount of computing power they demonstrably received, providing a benchmark against which reported and invoiced power costs can be tested.[22]



74.    Hosting Source's decision to operate BlockMining's rigs in 'low power mode' or 'low, low power mode' for extended periods not only violated the agreed hashrate specified in the colocation agreement but also had a broader implication for the allocation of Mining resources within the facility. By reducing the power supplied to Block Mining's rigs, Hosting Source may

---

[22] *See* **Exhibit C** – Mining Calculations.

have been able to redirect available power to additional machines operated for other, unrelated customers. Potentially those customers with more lucrative contracts.

75.    This strategic diversion of power meant that Block Mining's rigs were unable to mine Bitcoin at the levels anticipated under the agreement, resulting in significant reduction in Block Mining's BTC output.

76.    Therefore, the outlined conduct by Hosting Source resulted in substantial financial and operational losses for Block Mining. By restricting access, misallocating resources, and failing to provide required transparency, Hosting Source undermined Block Mining's ability to manage its mining operations and realize expected returns.

**Calculation**

77.    The following table summarizes the quantity and model types of Antminer S19j Pro miners delivered:[23]

| Model | Units | Estimated Replacement Cost per Unit (USD)[24] | Total Estimated Replacement Cost (USD) |
|-------|-------|-----------------------------------------------|----------------------------------------|
| S19j Pro 88T | 5 | $1,500 – $1,700 | $7,500 – $8,500 |
| S19j Pro 92T | 97 | $1,600 – $1,800 | $155,200 – $174,600 |
| S19j Pro 96T | 284 | $1,700 – $2,000 | $482,800 – $568,000 |

---

[23] The mining rig machine type and mix were taken from BM00000088.XLSX which lists the machines allocated to Block Mining. Additionally, the 1508 machines above reconcile with the removal schedule identified in Marchiori declaration Exhibit I in addition to the mention of 1508 in para 20 of the same document.

[24] Estimated replacement costs for Bitmain Antminer S19j Pro models (88T, 92T, 96T, 100T, 104T) are based on current listings and market prices from reputable hardware vendors and marketplaces, including eBay, Newegg, BT-Miners, Amazon, Zeus Mining, and Crypto Miner Source.

| Model | Units | Estimated Replacement Cost per Unit (USD)[24] | Total Estimated Replacement Cost (USD) |
|---|---|---|---|
| S19j Pro 100T | 453 | $1,800 – $2,100 | $815,400 – $951,300 |
| S19j Pro 104T | 669 | $1,900 – $2,200 | $1,271,100 – $1,471,800 |

78.    The number of units for each S19j Pro model was taken directly from the equipment schedule in the colocation agreement. This ensures the calculation is based on the actual hardware deployed under the contract.

79.    The agreement specifies that damages should be calculated on a "replacement-basis" rather than a "depreciation-basis."

80.    The replacement cost per unit is determined using current market prices for each S19j Pro model, as of post-halving (April to August 2024).

81.    Market prices were sourced from leading resellers and recent auction data (Bitmain, Compass Mining, Kaboomracks, etc.), reflecting the impact of the halving event on hardware value.

82.    For each model, the total replacement cost is calculated by multiplying the number of units by the estimated replacement cost per unit:

*Total Replacement Cost*

*=*

*Number of Units × Replacement Cost per Unit*

**Impact of the Halving on Replacement costs**

83.     The halving event, which occurred in April 2024, caused mining rewards to decrease by half, resulting in rapid depreciation of existing equipment and a significant increase in replacement costs.

84.     As a result, the cost to replace Block Mining's equipment is substantially higher than its depreciated value.

## VI. CONCLUSION

85.     Based on the above, Hosting Source repeatedly failed to meet its contractual obligations to Block Mining, Inc. under the colocation agreement for the operation and management of Block Mining's Bitcoin mining rigs.

86.     Rather than providing the agreed-upon mining power, timely access, and transparent accounting, Hosting Source operated Block Mining's rigs at significantly reduced hash rates, withheld access to equipment, and failed to return rigs as required, resulting in substantial operational and financial harm to Block Mining.

87.     The company mined far less Bitcoin than it was entitled to, suffered direct financial losses exceeding $1 million, and was deprived of the full economic benefit of its mining assets.

88.     Hosting Source's actions, including running rigs in low power mode, diverting power to other customers, and possibly redirecting BTC rewards, further exacerbated Block Mining's losses.

89.     Block Mining also incurred additional damages due to the depreciation of its rigs, lost mining rewards, and missed opportunities to capitalize on favorable market conditions.[25]

90.     The persistent lack of transparency and accountability from Hosting Source, including unsupported claims for fees and denial of monitoring access, prevented Block Mining from effectively managing its operations and verifying compliance.

Dated: September 22, 2025
        Jupiter, Florida

                                        /s/ *James P. Brennan*
                                        James P. Brennan

                                        Senior Managing Director
                                        J.S. Held, LLC

---

[25] While I have not calculated attorneys' fees, I have been advised that they may be available, as well as other damages and statutory interest that I have no calculated and were not within the scope of my report.

## EXHIBIT A: DOCUMENTS RELIED UPON

Below is a list of the documents relied upon for my report:

BM00000005.XLSX

BM00000088.XLSX

BM00000215.XLSX

BM00000216.XLSX

BM00000924.XLSX

BM00000925.XLSX

BM00000926.XLSX

BM00000927.XLSX

BM00000928.XLSX

BM00000929.XLSX

BM00000930.XLSX

BM00000931.XLSX

PROD-DEF- 00000834.XLSX

PROD-DEF- 00000835.XLSX

PROD-DEF- 00000836.XLSX

PROD-DEF- 00000837.XLSX

Erik Ellingson Declaration (Doc. No. 4).pdf

Frank Marchiori Declaration (Doc. No. 5).pdf

Joe (Kamia) Teegarden - 07-07-2025.pdf

HS00181 2024.06.25 _ Total BlockWare Accounting.xlsx

**EXHIBIT B: JAMES P. BRENNAN CURRICULUM VITAE**

**EXHIBIT C: Mining Calculations**

**J S | HELD**

# JP Brennan
## Senior Managing Director, Global Investigations, Crypto, Fintech, and Payments Advisory and Investigations

## Key Expertise



- Forensic Accounting
- Anti-money Laundering ("AML")
- Compliance
- Investigations
- Damages
- Financial Crime
- Fraud
- Asset Tracing (Crypto + Traditional)
- Money Services Business ("MSBs")
- Operational Due Diligence
- Cryptocurrency Security Standard ("CCSS")
- KYC / Onboarding
- Managed / Outsourced Services

## Education

Master of Science (MS), St. John's University, 2002

Bachelor of Science (BS), St. John's University, 2001

## Project Geographical Experience

U.S., UK, Singapore, Bermuda, Canada, Bahamas, Gibraltar, Cyprus, Switzerland

## Languages

English

## Summary of Experience

JP Brennan is the Global Head of Fintech, Payments, Crypto Compliance and Investigations at J.S. Held. He brings over 20 years of experience in forensic accounting, damage calculation, auditing, litigation consulting, anti-money laundering ("AML") compliance, cryptocurrency regulatory compliance, OFAC/sanctions review, complex enhanced and operational due diligence, and bankruptcy. He has an in-depth understanding of the complexities that many FinTech's are faced with concerning their regulatory framework as well as those issues from a financial crime compliance perspective.

Mr. Brennan has substantial experience in providing complex forensic accounting and financial fraud investigative services, cryptocurrency asset / wallet tracing, development and implementation of AML programs, outsourced Chief Compliance Officer services, as well as providing managed services for large scale remediation and compliance projects. His clients include major law firms, cryptocurrency exchanges (centralized / decentralized), digital asset issuers, custodians, multinational banks, funds, payment processors, financial institutions, and investors.

His expert experience includes such high-profile matters such as Bernard L. Madoff Investment Securities (investigation), Lehman Brothers (bankruptcy investigation), Caesars Entertainment Operating Corp. (examiner report), Bank of New York-Mellon (compliance monitorship), Quadriga CX (crypto asset tracing), and LUNA Foundation Guard (crypto asset tracing).

## Speaking Engagements

Mr. Brennan has presented various forums as well as moderated multiple cryptocurrency-related panels that included topics such as investigations, risk and regulatory, asset recovery, crypto in bankruptcy as well as complex forensic tracing.

## Professional Affiliations/Memberships/Licenses/Training

Association of Certified Fraud Examiners

Certified Bitcoin Professional

## Role at J.S. Held

JP is involved with matters in consulting as well testifying expert capacity. These matters include fiat and digital asset forensic and tracing investigations, recovery of assets, the development, implementation and assessment of regulatory programs, monitorships, training for law enforcement agencies, government licensing, investigations on behalf of examiners, receivers, forensic accounting, and trustees.

## Contact

48 Wall Street, New York, NY 100436 | +1 212-952-5000 (O) | +1 917-244-8931 (M) | jp.brennan@jsheld.com

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other. public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**J S | HELD**

## JP Brennan
Senior Managing Director, Global Investigations, Crypto, Fintech, and Payments Advisory and Investigations

## Work Experience

J.S. Held, LLC, Senior Managing Director, 2022 – Present

Kroll, LLC (f/k/a Duff & Phelps), Associate Managing Director, 2017 – 2022

Alvarez & Marsal Holdings, LLC, Director, 2012 – 2017

FTI Consulting, Inc., Director, 2004 – 2012

Deloitte & Touche LLP, Audit Staff, 2002 – 2004

## Select Litigation and Project Experience

### Cryptocurrency and Blockchain Related:

- Retained as the cryptocurrency expert in the Chapter 11 Bankruptcy Proceedings for Prime Trust due to insolvency. Provides litigation consulting and expert witness services related to the investigation of the company as well as performance of other analysis including but not limited fraudulent conveyances and preference payments.

- Retained by a U.S. cryptocurrency exchange as an expert to defend against customer allegations involving the exchanges breach of fiduciary duty and lack of an appropriate AML program.

- Retained in the Voyager Digital Bankruptcy to investigate and recover fraudulent ACH customer payments.

- Retained by a Web3 company that provides infrastructure and applications to be built using its platform. Perform expert and litigation services to defend against allegations of market manipulations, inappropriate disclosure for sources and uses of funds, unjust enrichment, and breach of fiduciary duty.

- Luna Foundation Guard / Terraform Labs / Do Kwon – retained to produce an audit report and cryptocurrency tracing of the assets used to defend the peg of the UST algorithmic stablecoin. Additional work related to market manipulation, wash trading, improper public disclosures, and manipulation of transactions on the Terra network.

- Retained by the Brazilian gov't to conduct the cryptocurrency asset tracing and recovery in the INDEAL pyramid scheme.

- Retained as the expert in a cryptocurrency employment dispute related to the payment of assets at genesis and calculation of the associated staking rewards and airdrops on the Cosmos Network.

- Retained as the expert by the Cred Inc. Liquidation Trust to trace and investigate the theft and fraudulent transfer of assets by Company executives.

- Retained by Bo Shen in the recovery of over $40 million stolen from his personal wallet.

- QuadrigaCX – retained by the receiver (E&Y) to conduct the tracing of cryptocurrency assets.

- Retained as the financial adviser in the EminiFX bankruptcy and investigation.

- Retained by the Canadian courts in the Index Finance hack as the custodian for the cryptocurrency assets stolen.

- Retained as the expert in a well-known international gambling site dispute.

- Retained in the USA v. Ian Freeman (formerly Ian Bernard) and Aria DiMezzo (formerly James Baker) to assist with various litigation support services.

- Conducted and performed operational due diligence for financial and crypto related platforms including but not limited to trade execution, custody, and third-party providers.

- Often retained by bitcoin atm operators, crypto lenders, crypto funds, crypto exchanges, payment processors, and funds to conduct independent AML reviews.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other.

public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**JP Brennan**

Senior Managing Director, Global Investigations, Crypto, Fintech, and Payments Advisory and Investigations

- Developed and implemented tracing and monitoring processes and technologies for a crypto money servicer business ("MSBs").
- Retained by the receiver in a Canadian cryptocurrency exchange investigation and recovery of assets.
- Retained by a large Seychelles-based cryptocurrency exchange to provide a report on proper OTC related procedures.
- Successfully performed an investigation into the fraudulent theft of cryptocurrency related assets of a crypto lender.
- Member of an international FATF committee working on the Travel Rule for Virtual Asset Providers ("VASPs").
- Performed the outsourcing of cryptocurrency asset reviews for a major US Cryptocurrency Exchange.
- Provide Managed Services for enhanced due diligence procedures for a major US Cryptocurrency Exchange.
- Retained by a U.S. Cryptocurrency Exchange to address regulatory concerns regarding their geo-fencing of IP addresses.
- Retained by a U.S. crypto lender in connection with their 2017 initial coin offering ("ICO") to provide recission payments to investors.
- Conducted cryptocurrency security standard ("CCSS") implementations and assessments.
- Conduct annual FBI Training – "How to Conduct Cryptocurrency Investigations."
- Provided and oversaw a team of 350+ compliance professionals to help meet a New York State Department of Financial Services remediation for a large US-based cryptocurrency exchange.

**Non-Cryptocurrency and Blockchain Related:**

- Provided investigative services and litigation support to the court-appointed trustee for the liquidation of Bernard L. Madoff Investment Securities and his counsel.  Engagement assistance to date has included the day-to-day direction and supervision of teams in areas including forensic investigation, data analysis and litigation consulting.
- Retained by the US Federal Reserve Bank to review AML Programs for their 12 branches.
- Served on the team selected by the U.S. Attorney offices in the Eastern and Southern Districts of New York and Western Pennsylvania to support the monitoring of the non-prosecution agreements of both The Bank of New York and Mellon Financial Corporation, to monitor and report on the state of the banks' suspicious activity reporting practices and AML procedures.
- Served on the monitorship team for the Standard Chartered Bank.
- Provided litigation consulting and expert witness services, including expert report preparation and deposition and trial preparation for a multi-billion-dollar accounting malpractice case filed in a class action against one of the major accounting firms. The case involved review and analysis of several years of audit work papers as well as research and analysis.
- Provided litigation consulting, including expert report preparation and deposition and trial preparation for an oil and gas company to determine whether a series of corporate transactions constituted a fraudulent conveyance and as a result rendered the company insolvent.
- Retained by multiple hedge funds to dispute the SEC allegations of collusion related to trade and market manipulation.
- Created onboarding policies and procedures for banks, hedge funds, as well as crypto funds and exchanges.
- Served on the investigations team, retained by Caesars Entertainment Operating Company, Inc. ("CEOC"), Richard J. Davis, to investigate and determine whether fifteen transactions between CEOC and the leveraged buyout sponsors ("LBO") arose to constituted constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary duty.
- Expert support work on the determination of payments to creditors in the Nortel Networks bankruptcy.
- Expert support work on the calculation of damages / lost profits for a pharmaceutical dispute.
- Expert support in the investigation into various matters within the Lehman bankruptcy.
- Expert support in the investigation of Allen Stanford.
- Hired as the outsourced CCO multiple payment processors that are going through the money transmission licensing process.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other. public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**JS | HELD**

**JP Brennan**
Senior Managing Director, Global Investigations, Crypto, Fintech, and Payments Advisory and Investigations

## Speaking Engagements and Articles

- Law360 article, Using Data To Arm Against Future Crypto Market Turbulence", December 16, 2022.

- Luna Foundation Guard release, "Today, LFG releases the technical audit report conducted by JS Held, an experienced third-party auditing firm, providing full transparency into the trading, blockchain records, and efforts of LFG and TFL to defend the price of TerraUSD ($UST) between May 8th & May 12th, 2022", November 16, 2022.

- Brave NewCoin article, "The Cryptocurrency Regulatory Framework: How Countries are Approaching the Virtual Currency", March 2022.

- Wolters Kluwer Banking and Financial Services Policy Report – April 30, 2019, "The Curious Case of Crypto."

- Kroll article, "Cryptocurrencies: Protecting Your Downside in the Face of Uncertainty", May 2018.

- Medium Article Contributor: https://medium.com/@james.p.brennan1.

- Official Monetary and Financial Institutions Forum ("OMFIF") Digital Monetary Institute Symposium 2021, "Cryptocurrency's Regulatory Impact", September 2021.

- MIT: Center for Real Estate," Real Disruption - How Technology is Changing and Challenging Real Estate", 2017.

- Kroll, "Examining the Anti-Money Laundering (AML) Risks and Red Flags of Crypto Exchanges", October 2021.

- BPP Continuing Education, "What you need to know when your clients are considering crypto", 2021.

- Association of Certified Fraud Examiners, "The Future of AML and Blockchain", May 2021.

- JS Held Thought Leadership Related Articles.

## Testimony

- *Michael Sofaer v. BKCM, LLC, Supreme Court of the State of New York, County of New York.*

- *Paul Merkley v. Gemini Trust Company, LLC,* JAMS Arbitration.

- *Jonathan Shomroni v. Fei Labs Inc. et al, Superior Court of the State of California, County of San Francisco.*

- *Prime Core Technologies Inc. et al, United States Bankruptcy Court, District of Delaware.*

- *MB Technology LTD v. Orbis Blockchain Technologies et al, High Court of New Zealand, Auckland Registry.*

- *Mobile Med Work Health Solutions, Inc.; JLL Ventures, Inc. and M-M WHS LLC v. Joshua Moore, Cory Rodruguez, NFN8 Group, Inc.; NFNF8 Holdings, LLC, NFN8 Capital, LLC; NFN8 Media, LLC, NFN8 Foundation, and Cryptotech Holdings LLC, United States District Court, Western District of Texas.*

- *Tiffany Enger v. Patrick Enger, In The Fourth Judicial District Court Utah County, State of Utah.*

- *The Office of the Minnesota Attorney General Keith Ellison, In the Matter of the Money Transmission License of Coinme Inc., d/b/a Coinme.*

- *Eide Bailly LLP vs. Seven Peaks Ventures Fund II, LP; and SPV – Prime Core, LLC / Seven Peaks Ventures Fund II, LP; and SPV – Prime Core, LLC vs. Eide Bailly LLP, District Court, Clark County Nevada.*

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other. public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.