UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BLOCK MINING, INC., | CASE NO. C24-0319JLR |
| Plaintiff, | ORDER |
| v. | |
| HOSTING SOURCE, LLC, | |
| Defendant. | |

## I.   INTRODUCTION

Before the court is Plaintiff / Counter-Defendant Block Mining, Inc.'s ("Block Mining") motion for partial summary judgment.  (Mot. (Dkt. # 78); Reply (Dkt. # 85).)  Defendant / Counter-Claimant Hosting Source, LLC ("Hosting Source") opposes the motion.  (Resp. (Dkt. # 82).)  The court has considered the parties' submissions, the

relevant portions of the record, and the applicable law. Being fully advised,[1] the court GRANTS Block Mining's motion for partial summary judgment.

## II. BACKGROUND

The court set forth the factual and procedural background of this matter in its prior orders and does not repeat that background here except as is relevant to this order. (6/14/24 Order (Dkt. # 48); 10/4/24 Order (Dkt. # 57); 7/25/25 Order (Dkt. # 73).)

This case arises out of Hosting Source's alleged breach of the parties' December 29, 2021 Colocation Mining Services Agreement (the "Agreement"), under which Hosting Source agreed to house and operate Block Mining's Bitcoin mining machines ("Rigs") at Hosting Source's mining facility located in East Wenatchee, Washington. (Compl. (Dkt. # 1) ¶ 26; Am. CC (Dkt. # 50); *see* Teegarden Decl. (Dkt. # 83) ¶ 4, Ex. A (the "Agreement"); *see also* Wolf Decl. (Dkt. # 81) ¶ 12, Ex. 34 (same).) Under the Agreement, Hosting Source was to install and supply power to Block Mining's Rigs to enable them to mine Bitcoin ("BTC"). (Stoltzner Decl. (Dkt. # 80) ¶ 13; Teegarden Decl. ¶¶ 14; *see generally* Agreement.) The Agreement also provided Block Mining with certain physical and remote VPN access rights so it could monitor and inspect its Rigs. (*See* Agreement §§ 2.5, 2.7.) In exchange, Hosting Source earned a portion of the Bitcoin mining rewards generated by Block Mining's Rigs at its mining facility. (*See* Agreement § 6.)

---

[1] Hosting Source requests oral argument and Block Mining does not. (*See* Resp at 1; Mot. at 1.) The court concludes that oral argument would not aid in its disposition of the motion. *See* Local Rules W.D. Wash. LCR 7(b)(4).

In September 2022, Block Mining, Hosting Source, and NYDIG ABL LLC ("NYDIG"), the third-party lender that had financed Block Mining's purchase of the Rigs, entered into an agreement of NYDIG's ownership interest in the Rigs housed at Hosting Source's facility. (*See* Teegarden Decl., Ex. B ("Landlord Waiver"); *see also id*. ¶ 21.) The Landlord Waiver includes, in relevant part, provisions governing NYDIG's security interest in the Rigs and the procedures to be followed in the event of Block Mining's default. (*See id*. §§ 3-7.)

In January 2023, Hosting Source received notice from NYDIG that Block Mining defaulted on its loan obligation with respect to its Rigs. (*See* Teegarden Decl. ¶ 14; *see also* Teegarden Depo. at 99.) Hosting Source then reduced the power supplied to the Rigs beginning in February 2023. (*See* Wolf Decl. ¶ 4, Ex. B ("Teegarden Depo.") at 115; Stoltzner Decl. ¶ 18.) After Block Mining cured the default, however, Hosting Source continued to operate the Rigs on a lower power mode thereby limiting the amount of Bitcoin that Block Mining's Rigs mined each day. (Stoltzner Decl. ¶¶ 18-19; Teegarden Depo. at 222, 226; *see also* Wolf Decl. ¶ 12, Exs. 55, 56 (showing the parties' discussion about Block Mining's cure of its default and their agreement to run the Rigs in full power mode).)

The relationship between the parties continued to deteriorate. (*See* Teegarden Depo. at 147.) Ultimately, Hosting Source terminated the Agreement, shut down Block Mining's Rigs, and removed Block Mining's VPN access, thereby preventing Block Mining from monitoring its Rigs. (*Id*. at 178; *see also* Miller Decl. (Dkt. # 79) ¶ 5, Ex. A ("Riddell Email").) On March 5, 2024, Block Mining sent personnel to the Hosting

Source facility to inspect and take possession of its Rigs, but was not permitted by Hosting Source to do so. (*See* Ellingson Decl. (Dkt. # 4) ¶ 27; Teegarden Depo. at 154.)

On March 8, 2024, Block Mining filed the instant suit against Hosting Source asserting claims for breach of contract, conversion, and trespass to chattels under Washington Law. (Compl. ¶¶ 78-97.) Block Mining also moved for a temporary restraining order and preliminary injunction to compel Hosting Source to allow Block Mining to collect its Rigs. (TRO Mot. (Dkt. # 2).) On March 18, 2024, the court denied Block Mining's motion for a temporary restraining order, concluding that such relief was not warranted because "the harm at issue is plainly economic and thus can be remedied by an award of damages." (3/18/24 Order (Dkt. # 20) at 13.) The value of Block Mining's Rigs depreciated in value during the period Hosting Source refused to return them because a Bitcoin halving event was scheduled in April 2024. (Stoltzner Decl. ¶ 21 (describing a periodic event called "halving" subject to which "mining rewards were reduced by 50%).)

On June 28, 2024, Hosting Source asserted a breach of contract counterclaim in connection with Block Mining's alleged failure to timely pay Hosting Source the amount due every month. (*See e.g.*, Am CC ¶¶ 130, 143, 147-148, 154.) Block Mining moved to dismiss Hosting Source's amended counterclaim. (*See generally* MTD (Dkt. # 53).) The court granted in part and denied in part Block Mining's motion to dismiss. (*See* 10/4/24 Order.) The court concluded, in relevant part, that Hosting Source plausibly alleged a claim for breach of §§ 5 and 6 of the Agreement, which govern payment of electricity costs, profit sharing, and contract termination (*id*. at 13-15), but failed to plausibly allege

ORDER - 4

a breach of contract claim based on Block Mining's default on its NYDIG loan (*id*. at 16-18).

Block Mining now moves for partial summary judgment (1) as to liability on its claim for breach of contract, (2) on Hosting Source's counterclaim for breach of contract (3) on its claim for conversion, and (4) on its claim for trespass to chattel. (*See* Mot. at 17-27.)

### III.   ANALYSIS

The court first addresses the legal standard for summary judgment and then considers Block Mining's motion.

**A.   Legal Standard**

Summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is material if it may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*.

Where the party moving for summary judgment has the burden of persuasion at trial, such as where the moving party seeks summary judgment on its own claims or defenses, the moving party must establish "'beyond controversy every essential element of its' [claim]." *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (citation omitted).  Where the moving party seeks summary judgment on a claim or defense on which the opposing party bears the burden of persuasion at trial, however,

"the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted). If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence showing a genuine issue of material fact. *Id*. at 1102-03. If the nonmoving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (citing *Clicks Billiards Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001)). However, the nonmovant must direct the court's attention to "specific, triable facts." *S. California Gas. Co.*, 336 F.3d at 889. "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *City of Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**B.     Block Mining's Claim for Breach Contract**

Block Mining moves for partial summary judgment as to liability on its breach of contract claims, asserting that Hosting Source breached the Agreement provisions

"entitling Block Mining to immediate possession of its Rigs, remote access to monitor them, and sufficient mining power to achieve the Rigs' name-plate hash rate."[2] (Mot. at 12.) Block Mining does not seek summary judgment as to the amount of damages it is entitled. (*See id*. at 12-14); *see* Fed. R. Civ. P. 56(c) (setting forth that a party may move for summary judgment on part of a claim or defense). Hosting Source asserts that, in light of Block Mining's default, its conduct "was in conformity with the parties['] agreement." (Resp. at 5-6.)

Because Block Mining bears the burden of persuasion on its claims for breach of contract at trial, to prevail on its motion for summary judgment, Block Mining also bears the burden of showing that Hosting Source was subject to a contractual duty, Hosting Source breached that duty, and Hosting Source's breach was the proximate cause of Block Mining's damages. *Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995).

Block Mining contends that Hosting Source breached the following duties set forth in the Agreement: (1) the duty to effectuate Block Mining's "immediate possession" of its Rigs upon termination of the Agreement as set forth in §§ 11.2 and 11.3 of the Agreement; (2) the duty to provide Block Mining with "VPN access or other third-party software access . . . to view, monitor and remotely regulate performance of [Block Mining's Rigs]" as set forth in § 2.7 of the Agreement; and (3) the duty to supply

---

[2] "The power necessary to mine [Bitcoin] is generally expressed in terms of a 'hash rate,' which is the amount of computing power dedicated to solving the cryptographic puzzles to create additional blocks in the BTC blockchain. Hash rates are oftentimes expressed in terms of PetaHash per second ('PH/s')." (Compl. ¶ 24.)

ORDER - 7

sufficient mining power to achieve the Rigs' name-plate hash rate as set forth in Exhibit B of the Agreement.  (Mot. at 12-13; *see also* Agreement, Ex. B ("Exhibit B").)  Block Mining further contends that it suffered damages as result of Hosting Source's conduct because (1) it "fail[ed] to realize the value of the Rigs" prior to the April 2024 Bitcoin halving and (2) "for the time and money it spent providing notice to Hosting Source, traveling to the Facility, and leaving empty-handed."  (Mot. at 14; Stoltzner Decl. ¶ 21.)  The court agrees with Block Mining.

First, with respect to returning Block Mining's Rigs, the court has already concluded that §§ 11.2 and 11.3 of the Agreement unambiguously entitled Block Mining to "immediate possession of all" of its Rigs upon termination of the Agreement "for any reason[,]" thus imposing a duty on Hosting Source to return the Rigs.  (Agreement §§ 11.2, 11.3; *see* 6/14/24 Order at 16 (so concluding).)  On November 20, 2023, Hosting Source terminated the Agreement with respect to 402 Rigs when it gave Block Mining a 60-day notice of nonrenewal.  (*See* Teegarden Depo at 178, 183.)  It terminated the Agreement with respect to the remaining Rigs on or around February 1, 2024.  (*See* Riddell Email.)  Hosting Source breached its duty to effectuate the immediate return of the Rigs on March 5, 2024, when it denied Block Mining's personnel access to Hosting Source's facility and refused to permit them to take possession of the Rigs.  (*See* Teegarden Depo. at 154 (stating that Hosting Source leadership and staff "purposely tried…to not be at the [Hosting Source facility] to avoid any kind of confrontation with [Block Mining]"); *see also* Ellingson Decl. ¶ 27 ("Hosting Source did not provide access to our Rigs.").)

1    In response, Hosting Source does not cite evidence that would establish a genuine
2 issue of fact as to any of the elements of Block Mining's claim.  (*See generally* Resp.);
3 *see also* Fed. R. Civ. P. 56(c) (setting forth that, to bear its burden of production, Hosting
4 Source must cite "materials in the record, including depositions,
5 documents . . . interrogatory answers, or other materials" to show that a fact is genuinely
6 disputed).  Rather, Hosting Source asserts without citation to factual support that the
7 court should deny Block Mining's motion because Hosting Source's conduct "was in
8 conformity with the parties['] agreement" and because it "performed according to the
9 contract."  (Resp. at 5-6.)  Therefore, the court concludes that Block Mining has met its
10 burden to show that it is entitled to judgment as a matter of law regarding liability for
11 breach of §§ 11.2 and 11.3 of the Agreement.

12    Second, with respect to VPN access, Hosting Source had a contractual duty to
13 provide Block Mining "VPN access or other third-party software access . . . to view,
14 monitor and remotely regulate performance of [Block Mining's Rigs]."  (*See* Agreement
15 § 2.7.)  On March 2, 2024, Hosting Source breached that duty when it removed Block
16 Mining's VPN access following the termination of the Agreement.  (Teegarden Depo. at
17 146-47 (testifying that Hosting Source provided Block Mining with "TeamViewer"
18 access until approximately March 2024 and terminated that access because Block Mining
19 purportedly was not "paying for the services.").)  Hosting Source is silent as to whether it
20 satisfied this duty and does not cite evidence that would establish a genuine issue of fact
21 as to any of the elements of Block Mining's claim.  (*See generally* Resp.)  Therefore, the
22

ORDER - 9

court concludes that Block Mining has met its burden to show that it is entitled to judgment as a matter of law regarding liability for breach of § 2.7 of the Agreement.

Finally, with respect to Hosting Source's duty to supply sufficient power to Block Mining's Rigs, Exhibit B of the Agreement sets forth the hash rate for each Rig hosted by Hosting Source. (*See* Exhibit B (showing the Agreement required Hosting Source to supply the Rigs with sufficient mining power to enable them to operate at a cumulative hash rate of 141.704 PH/s).) Hosting Source initially ran the Rigs so that they could achieve the name-plate hash rate, but decreased the power supplied to the Rigs starting in February 2023 when NYDIG issued notice of Block Mining's default to Hosting Source. (Teegarden Depo. at 114-115, 226 (discussing Hosting Source's decision to either reduce or discontinue the supply of power to the Rigs after receiving notice of Block Mining's default).) Hosting Source never returned the supply of power to the Rigs to a level sufficient to achieve the contractually obligated hash rate. (*Id.*) Again, Hosting Source is silent as to whether it satisfied this duty and does not cite evidence negating Block Mining's claim. (*See generally* Resp.) Therefore, the court concludes that Block Mining has met its burden to show that it is entitled to judgment as a matter of law regarding liability for Hosting Source's breach of its duty to supply sufficient power to Block Mining's Rigs as set forth in Exhibit B of the Agreement.

C. **Hosting Source's Counterclaim for Breach of Contract**

Block Mining also moves for summary judgment on Hosting Source's counterclaim for breach of contract. (*See* Mot. at 21-22.) Hosting Source asserts that Block Mining breached §§ 5 and 6 of the Agreement by failing to pay in full the amounts

1 owed and that Hosting Source incurred damages as a result of that breach. (Am. CC

2 ¶¶ 148, 150-54.) Because Hosting Source bears the burden of proving its counterclaim

3 for breach of contract at trial, Block Mining must demonstrate that Hosting Source "does

4 not have enough evidence of an essential element [of its claim] to carry its ultimate

5 burden of persuasion at trial." *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102 (citation

6 omitted).

7 Block Mining has presented evidence that it satisfied its payment obligations and

8 Hosting Source "believe[d] all of 2021 was settled[.]. (*See* Wolf Decl. ¶ 12, Ex. 50 at 2

9 (providing email communications between the parties from February 2022 showing that

10 the parties agreed that Block Mining was "all squared up for 2021").) Although Hosting

11 Source provides some limited testimony that it sought payment, it has not directed the

12 court to evidence that, viewed in the light most favorable to Hosting Source, supports its

13 claim that Block Mining breached its duties under §§ 5 and 6 of the Agreement. (*See*

14 Teegarden Depo. at 15253; *see* Wolf Decl. ¶¶ 57; *see id*. Ex. C at 45 (stating that the

15 communications documenting Block Mining's payment delinquency were "too numerous

16 to detail" and asserting that by December 2021 "Hosting Source was owed at least

17 $975,381.45").) Therefore, the court concludes that Block Mining has met its burden to

18 show that it is entitled to judgment as a matter of law on Hosting Source's counterclaim

19 for breach of Block Mining's duty to pay for services as set forth in §§ 5 and 6 of the

20 Agreement.

21 //

22 //

**D.      Block Mining's Claim for Conversion**

Block Mining also moves for summary judgment on its claim that Hosting Source converted its Rigs by refusing to surrender them upon Block Mining's demand for their immediate repossession. (*See* Mot. at 14-16.)

"Conversion is the unjustified, willful interference with a chattel which deprives a person entitled to the property of possession." *In re Marriage of Langham & Kolde*, 106 P.3d 212, 218 (Wash. 2005) (quoting *Meyers Way Dev. Ltd. P'ship v. Univ. Sav. Bank*, 910 P.2d 1308, 1320 (Wash. Ct. App. 1996)). To prevail on a motion for summary judgment on a claim for conversion, Block Mining must show through undisputed facts that Hosting Source (1) willfully interfered with chattel belonging to Block Mining, (2) by either taking or unlawful retention, and (3) thereby deprived Block Mining of possession. *Burton v. City of Spokane*, 482 P.3d 968, 970 (Wash. Ct. App. 2021).

The court concludes that Block Mining has shown that it is entitled to judgment as a matter of law that Hosting Source converted Block Mining's Rigs by unlawfully retaining them. The Agreement unambiguously establishes that the Rigs were the exclusive property of Block Mining. (*See* Agreement §§ 3.2 ("For the avoidance of doubt, all [Rigs] shall remain the sole property of [Block Mining]."); 11.2 (providing that upon "termination of this Agreement . . . [Block Mining] shall be entitled to the immediate possession of all Mining Equipment"); 11.3 (stating that the Rigs "shall remain the exclusive property of [Block Mining]" and requiring Hosting Source, upon termination of the Agreement for any reason, to "provide [Block Mining] with immediate and unconditional access to" the Facility "to allow [Block Mining] to modify, protect, or

remove the [Rigs]").) On November 20, 2023, Hosting Source terminated the Agreement with respect to 402 Rigs when it gave Block Mining a 60-day notice of nonrenewal. (*See* Teegarden Depo at 178.) It terminated the Agreement with respect to the remaining Rigs on or around February 1, 2024. (*See* Riddell Email.) Hosting Source subsequently refused to immediately surrender all of the Rigs to Block Mining as required. (*See* Teegarden Depo. at 154; *see also* Ellingson Decl. ¶ 27.)

In response, Hosting Source argues (1) that the economic loss rule and independent duty doctrine preclude Block Mining's recovery on its tort claim; (2) that, in light of Block Mining's default, the Agreement permitted Hosting Source to "take action to protect itself[,]" namely to convert Block Mining's Rigs; and (3) that "[i]n no way was Hosting Source [acting as] a bailee[.]" (Resp. at 6-7.) The court disagrees with Hosting Source and finds that summary judgment on Block Mining's conversion claim is appropriate.

First, the court rejects Hosting Source's argument that the independent duty doctrine prohibits Block Mining from asserting both breach of contract and tort law claims. Hosting Source cites a Washington Supreme Court case, *Eastwood v. Horse Harbor Found., Inc.*, to support its assertion that "[t]he Economic Loss Rule and Independent Duty Doctrine apply to prohibit an award of damages under tort claims." (Resp. at 6); *see Eastwood v. Horse Harbor Found., Inc.*, 241 P.3d 1256, 1264 (Wash. 2010). *Eastwood*, however, does not support such a blanket preclusion of damages for tort claims. To the contrary, the *Eastwood* court held that the existence of a contract does not bar a plaintiff from bringing a tort claim if the defendant breached a duty that arises

independently of the contract's terms. *See Eastwood*, 241 P.3d at 1262 ("An injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract . . . . When no independent tort duty exists, tort does not provide a remedy."). Further, the Washington Supreme Court has specifically limited the application of the independent duty doctrine to claims arising out of construction on real property and real property sales. *Elcon Const., Inc. v. E. Washington Univ.*, 273 P.3d 965, 969 (Wash. 2012); *see, e.g.*, *In re Amazon Return Pol'y Litig.*, No. C23-1372JNW, 2025 WL 1237665, at *2 (W.D. Wash. Apr. 29, 2025). Thus, because this case pertains to Bitcoin mining Rigs, rather than real property, the independent duty doctrine does not preclude Block Mining from recovering on its conversion claim. *See Elcon Constr., Inc.*, 273 P.3d at 969-70.

Second, Hosting Source argues that it was permitted to take possession of Block Mining's Rigs because "Block Mining's financial difficulties [with NYDIG] violated its obligations to Hosting Source." (Resp. at 6.) The court, however, previously considered and dismissed Hosting Source's argument that the parties' Landlord Waiver modified the Agreement such that Block Mining's default constituted a breach of the Agreement, and thus permitted Hosting Source to breach its own duties under the Agreement. (*See* 10/4/24 Order at 1618.) To the extent Hosting Source makes a similar argument here, it fails to identify specific facts to support its position or produce evidence to show a genuine issue of material fact. (*See* Resp. 34 (repeating Hosting Source's prior argument that the Landlord Waiver modified the Agreement and Block Mining's default breached

ORDER - 14

1 the Agreement)).) Therefore, Hosting Source's argument that Block Mining's default
2 permitted Hosting Source to convert Block Mining's Rigs fails.
3        Finally, while the court disagrees that Hosting Source was not acting as a bailee,
4 Hosting Source need not be a bailee to be liable for conversion. *Judkins v. Sadler-Mac*
5 *Neil*, 376 P.2d 837, 839 (Wash. 1962) (quoting Restatement (First) of Torts § 237
6 (1934)) (establishing that any party who on demand "refuses to surrender its possession
7 to another entitled to the immediate possession thereof [] is liable for its conversion");
8 Black's Law Dictionary 169 (10th ed. 2014) (defining *bailment* as "the delivery of
9 personal property by one person (the bailor) to another (the bailee) who holds the
10 property for a certain purpose"). Thus, the court finds that Block Mining is entitled as a
11 matter of law to summary judgment on its claim for conversion against Hosting Source.
12 **E.     Block Mining's Claim for Trespass to Chattels**
13       Block Mining also moves for summary judgment on its trespass to chattels claim.
14 (*See* Mot. at 16-17.)
15       Trespass to chattels "is the intentional interference with a party's personal
16 property without justification that deprives the owner of possession or use." Restatement
17 (Second) of Torts § 217 (1965). "Claims for trespass to chattels and conversion are very
18 closely related." *United Fed'n of Churches, LLC v. Johnson*, 598 F. Supp. 3d 1084, 1099
19 (W.D. Wash. 2022). "[T]respass to chattels differs from conversion as a matter of
20 degree." *Id*. (internal quotation marks and citation omitted). Less serious interferences
21 fall under the Restatement's definition of trespass. *Compare* Restatement (Second) of
22 Torts § 222A(1) (1965) (defining conversion as "[a]n intentional exercise of dominion or

control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel[]"); *with id*., § 217 (defining trespass to chattel as an act "committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another."). Thus, to prevail on a motion for summary judgment on a trespass to chattels claim, Block Mining need not show any additional facts beyond those required to show liability for conversion.

Hosting Source does not address Block Mining's trespass to chattels claim aside from arguing that the independent duty doctrine bars the claim. (*See generally* Resp.) Therefore, Hosting Source fails to offer specific facts that show a genuine dispute as to any material fact. *See Celotex Corp.* 477 U.S. at 323. Consequently, the court concludes that Block Mining is entitled as a matter of law to summary judgment on its claim for trespass to chattels against Hosting Source.

**F.    Damages**

Finally, Block Mining moves for summary judgment as to damages for its tort claims for conversion and trespass to chattel. (*See* Mot. at 17-21.) Block Mining asserts that it is entitled to damages totaling 10.57 BTC, which comprises (1) 5.3 BTC that Hosting Source unlawfully sold and retained and (2) 5.27 BTC that purportedly would have been mined if Hosting Source ran the Rigs in full power mode during the time that they were converted. (*Id*. at 18-19.) Block Mining also petitions the court to award damages in Bitcoin because, if "Hosting Source had not converted Block Mining's Rigs, then Block Mining would have received [B]itcoin, not U.S. dollars[,]" and because

"[t]here is precedent in this District for entering a judgment denominated in cryptocurrency[.]" (Mot at 20.)  In response, Hosting Source contends that any judgment against Hosting Source is governed by § 8.2 of the Agreement, which limits the aggregate liability of the parties on claims "arising from or relating to [the] Agreement" to three months of gross revenue and the replacement of the Rigs.  (Resp. at 10; *see* Agreement § 8.2.)  The court concludes that Block Mining is entitled as a matter of law to total tort damages equal to the value in dollars of the 10.57 BTC, calculated as of September 15, 2024.

As an initial matter, § 8.2 of the Agreement is not controlling as to damages arising from Hosting Source's tortious conduct because that section pertains only to liability "arising from or relating to [the] Agreement" rather than to the parties' violations of tort duties not contemplated by the Agreement.  (Resp. at 10; *see Valve Corp. v. Sierra Ent. Inc.*, 431 F. Supp. 2d 1091, 1102 (W.D. Wash. 2004) (holding that defendants may not rely on an agreement provision limiting liability to prevent plaintiff's recovery of damages for a tort claim); *see also* Agreement § 8.2.  Therefore, Block Mining is entitled to damages as measured under tort law.  Under Washington law, if Hosting Source's conversion was willful, "the measure of damages is the highest market value of the property within a reasonable time after the conversion, or as sometimes stated, the highest price shown between the time of conversion and the institution of the suit." *Glaspey v. Prelusky*, 219 P.2d 585, 587 (Wash. 1950).  Washington law has not expressly defined willfulness for the purpose of calculating tort damages, but courts generally conclude that a party is liable for "willful conversion" unless it acted "unintentionally and

inadvertently[.]" *See id*. (distinguishing between "ordinary conversion" and "willful conversion" for the purpose of determining damages). Block Mining has shown, as a matter of law, that Hosting Source's conduct was willful because (1) Hosting Source admits that it mined and kept 5.3 BTC and (2) Hosting Source intentionally redirected proceeds from the unauthorized sale of Bitcoin mined by Block Mining's Rigs from an account controlled by Block Mining to an account controlled by Hosting Source. (*See* Teegarden Depo. at 226-27, 152-54). Thus, Block Mining may recover the highest market value of the 5.3 BTC that Hosting Source mined and kept.

Block Mining has also shown, as a matter of law, that it is entitled to recover consequential damages for the value of the Bitcoin that would have been mined had Hosting Source not converted Block Mining's Rigs between March 2 and June 7, 2024. *Dennis v. Southworth*, 467 P.2d 330, 332-33, 37 (Wash. Ct. App. 1970) (setting forth that a party may recover "consequential damages for a wrongful conversion in addition to the fair market value of the property[]"). Because Hosting Source acted willfully, Block Mining is entitled to the highest market value of the Bitcoin that would have been mined had Hosting Source run the Rigs in full power mode during the time of conversion between March 2 and June 7, 2024. *Glaspey*, 219 P.2d at 587.

Block Mining presents an expert report attesting that approximately 5.27 BTC would have been mined between March 2 and June 7, 2024, if Hosting Source had run the Rigs in full power mode during that time. (Wolf Decl. ¶ 1, Ex. G ("Brennan Report") at 19(i).) Hosting Source entirely fails to cite evidence that would establish a genuine issue of fact as to Block Mining's calculation of damages. (*See generally* Resp.)

Although Hosting Source also presents an expert report, its report is silent as to how much Bitcoin would have been mined during the time when Hosting Source converted the Rigs. (*See generally* Penderson Decl. ¶ 3, Ex. A ("Penderson Report").) Rather, that report focuses exclusively on the monthly calculations that the parties conducted to determine the "amounts due and owing to [Hosting Source] for power consumption and their 20% portion of the net profits[.]" (*Id*. at 1 ("This letter discusses the periodic credit calculations between [Hosting Source] and [Block Mining] and does not specifically address any other allegations between the parties at this time.").) Furthermore, Hosting Source's argument that Block Mining's damages should be reduced to account for Hosting Source's profit share, costs, and credits it issued to Block Mining fails because tortfeasors are not entitled to recover any expenses incurred while using the lawful owner's property. *See Saddle Mountain Mins., L.L.C. v. Joshi*, 95 P.3d 1236, 1239 (Wash. 2004) (finding that an injured party is entitled to recovery of their property without regard to the tortfeasor's expense of obtaining or improving it).

Finally, given the lack of controlling precedent supporting alternative theories, the court finds it appropriate to grant relief payable in U.S. dollars rather than in Bitcoin. Block Mining provides initial evidence showing that as of September 15, 2024, which is the date of the Brennan report, 10.57 BTC was valued at $1,219,746 U.S. dollars. (Brennan Report ¶ 41.) In response, Hosting Source is silent as to the value of the Bitcoin it converted and withheld from Block Mining and the appropriate date by which to calculate the conversion rate from Bitcoin to U.S. dollars. (*See generally* Resp.) Damages consisting of the highest market value of property subject to willful conversion

need only be calculated "within a reasonable time after the conversion." *Glaspey*, 219 P.2d at 587. Hosting Source presents no evidence that Block Mining's use of the value of one Bitcoin on September 15, 2024, to determine the highest market value of 10.57 BTC, and thus calculate total damages, is unreasonable. (*See generally* Resp.)

Consequently, the court grants total damages against Hosting Source in the amount of $1,219,746 U.S. dollars.

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS Block Mining's motion for summary judgment (Dkt. # 78) as to liability on Block Mining's claim for breach of contract, and on both liability and damages for Block Mining's claims for conversion and trespass to chattels. The court GRANTS Block Mining's motion for an award of damages against Hosting Source on its claims for conversion and trespass to chattels in the amount of $1,219,746 U.S. dollars, with prejudgment interest to run from June 7, 2024. Hosting Source's counterclaim for breach of contract (Dkt. # 50) is DISMISSED with prejudice.

Dated this 16th day of December, 2025.

JAMES L. ROBART
United States District Judge